UNITED STATES of America, Plaintiff-Appellant-Cross Appellee,

v.

T.I.M.E.-D.C., INC. and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendants-Appellants-Appellees.

UNITED STATES of America, Plaintiff-Appellant-Cross Appellee,

v.

T.I.M.E. FREIGHT, INC., et al., Defendants-Appellees-Cross Appellants,

International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendant-Appellant-Appellee.

No. 73–2214.

United States Court of Appeals, Fifth Circuit.

Aug. 8, 1975.

300

David L. Rose, William B. Fenton, Joel G. Contreras, Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., Frank D. McCown, U. S. Atty., Ft. Worth, Tex., Robert B. Wilson, Asst. U. S. Atty., Lubbock, Tex., for United States.

L. N. D. Wells, Jr., Hal K. Gillespie, Dallas, Tex., for Intern. Brotherhood.

Robert D. Schuler, R. Ian Hunter, Detroit, Mich., A. Read Cone, Bloomfield Hills, Mich., for defendant-appellant-appellee.

Before BROWN, Chief Judge, and AINSWORTH and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This governmental pattern and practice suit is one more in an ever-increasing number of Title VII employment discrimination cases arising out of the trucking industry and primarily involving the past exclusion of minority group members from the job of over-the-road-

line driver (LD).[1] The Government, T.I. M.E.–D.C., Inc. and the International Brotherhood of Teamsters (IBT) all appeal from an order and decree that found that T.I.M.E.–D.C. has engaged in a system-wide pattern and practice of discrimination in violation of §§ 703(a)(1), (2)[2] and 707(a)[3] of Title VII of the Civil Rights Act of 1964. This appeal is largely focused on the issues of whether the Government carried its burden of proving pattern and practice, and if so, whether the District Court's award of carry-over seniority relief to the affected class of Black and Spanish-surnamed American (SSA) incumbent employees was appropriate, adequate or both.

This litigation represents the culmination of the consolidation of two separate suits filed by the United States against T.I.M.E.–D.C. and the Teamsters.[4] The first was filed on May 15, 1968 in the Middle District of Tennessee, alleging that T.I.M.E. Freight, Inc. (a predecessor of T.I.M.E.–D.C., Inc., see table, note 6, *infra*), the IBT, and Teamster Local 480 (representing T.I.M.E. Freight employees at the Nashville terminal) were engaged in a pattern and practice of discrimination in violation of Title VII at T.I.M. E.'s Nashville terminal.

The second suit was filed January 14, 1971 in the Northern District of Texas, charging T.I.M.E.–D.C. and IBT with engaging in a pattern and practice of discrimination on a systemwide basis. The International Association of Machinists and Aerospace Workers was subsequently joined as a defendant. After transfer the suits were consolidated in the Northern District of Texas on April 30, 1971.

### The Government's Claim

Essentially the Government charged T.I.M.E.–D.C. with engaging in a pattern and practice of discrimination by

---

**1.** Three very recent cases are Rodriguez v. East Texas Motor Freight, 5 Cir., 1974, 505 F.2d 40; Herrera v. Yellow Freight System, Inc., 5 Cir., 1974, 505 F.2d 66; and Resendis v. Lee Way Motor Freight, Inc., 5 Cir., 1974, 505 F.2d 69, which were preceded by Franks v. Bowman Transportation Company, 5 Cir., 1974, 495 F.2d 398; Bing v. Roadway Express, Inc., 5 Cir., 1971, 444 F.2d 687 (Bing I); Belt v. Johnson Motor Lines, Inc., 5 Cir., 1972, 458 F.2d 443; Witherspoon v. Mercury Freight Lines, 5 Cir., 1972, 457 F.2d 496; United States v. Roadway Express, Inc., 6 Cir., 1972, 457 F.2d 854; Jones v. Lee Way Motor Freight, 10 Cir., 1970, 431 F.2d 245, cert. denied, 1970, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237; United States v. Central Motor Lines, W.D.N.C., 1971, 338 F.Supp. 532, 352 F.Supp. 1253; United States v. Pilot Freight Carriers, Inc., M.D.N.C., 1973, 54 F.R.D. 519; United States v. Navajo Freight Lines, Inc., C.D.Cal., 1973, 6 FEP Cases 274 & 1972, 4 FEP Cases 1044; Sagers v. Yellow Freight System, Inc., N.D.Ga., 1973, 5 EPD ¶ 8885, 5753; Sabala v. Western Gillette, Inc., 5 Cir., 1975, 516 F. 2d 1251.

**2.** 42 U.S.C.A. § 2000e–2(a)

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**3.** 42 U.S.C.A. § 2000e–6

Civil actions by the Attorney General—Complaint

(a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

**4.** Reference is made interchangeably to IBT and Teamsters unless otherwise indicated by the context.

(a) Refusing to recruit, hire, transfer and promote black and Spanish-surnamed persons on an equal basis with whites.

(b) Assigning blacks and Spanish-surnamed persons to lower paying, less desirable job classifications while reserving the higher paying, more desirable classifications for whites.

(c) Refusing to employ black and Spanish-surnamed persons as casuals (non-regular) employees on the same basis as whites.

(d) Refusing to promote or transfer black and Spanish-surnamed employees, or to provide an opportunity for such employees to transfer, to road driver, mechanic and managerial jobs on the same basis it has promoted, transferred and provided the opportunity to transfer for white employees to these jobs.

(e) Maintaining a system of promotions and transfers which perpetuates the effects of the company's past discrimination against black and Spanish-surnamed persons.

Pretrial Order ¶ 2.

The Government also alleged that IBT by itself and through its Area Conferences [5] and locals engaged in a pattern and practice of discrimination by entering into contracts which perpetuate the effects of past discrimination by impeding the transfer of Blacks and SSAs to more desirable jobs and by failing to take affirmative action to correct continuing effects of past discrimination.

Although the Government alleged and offered proof on a wide variety of discriminatory practices, its main complaint centered on the charge that T.I.M.E.–D.C. and its predecessors had refused to initially hire Blacks and SSAs as LDs and continued to perpetuate that discrimination by refusing to permit or discouraging them to transfer to LD vacancies.

### T.I.M.E.–D.C.'s Operations

T.I.M.E.–D.C. Inc. is a major interstate common carrier operating on a transcontinental basis, with headquarters in Lubbock, Texas. T.I.M.E.–D.C. operates 51 terminals in 26 states and three Canadian provinces and employs, 6,472 people. T.I.M.E.–D.C. nationwide motor freight system is a product of 10 mergers over a 17 year period.[6]

---

5. The Southern Area Conference covers those terminals within the states of Alabama, Florida, Georgia, Mississippi, Tennessee, Arkansas, Louisiana, Oklahoma and Texas. Seven termi-

nals for which the United States seeks class relief are within the Southern Area Conference. *See* Rodriguez, *supra,* at 47.

6.

**Merger History**

| Date | Company | Action | Result |
|---|---|---|---|
| 10/52 | Southwestern Freight Lines, Inc. | merged into | Intercity Motor Express forming T.I.M.E., Inc. |
| 9/54 | Harrington Truck Lines | " " | T.I.M.E., Inc. |
| 5/57 | Southeastern Truck Lines | " " | " " |
| 10/59 | Powell Brothers Truck Lines | " " | " " |
| 6/64 | Super Service Motor Freight | " " | T.I.M.E. Freight, Inc.* |
| 4/67 | Constructors Transport Co. | " " | " " " · " |
| 4/68 | A portion of the operations of Texas-Arizona Motor Freight | was acquired by | " " " |
| 1/69 | Los Angeles-Seattle Motor Express (LASME) ** and Denver-Chicago Trucking Co. (DC) *** | merged into | T.I.M.E. Freight, Inc. forming T.I.M.E. D.C., Inc. |

\* T.I.M.E., Inc. was changed to T.I.M.E. Freight, Inc.

** LASME was formed in 1932 in Seattle as Hendricks Refrigerated Express and served points between Vancouver and Los Angeles as of the date of the merger.

*** D.C. was formed in Denver in 1930 as Cohen Brothers Trucking and developed into a transcontinental carrier through a series of 12 mergers.

IBT is an unincorporated labor organization. T.I.M.E.–D.C. has signed a total of 124 separate collective bargaining agreements with 83 individual Teamster locals at its various terminals. Each contract consists of three basic parts, the National Master Freight Agreement, an Area Supplement and Local Riders or Addenda. The National Master and the Area Supplements are negotiated nationally on a multi-union, multi-employer basis. *See* Rodriguez, *supra,* at 47 and 60.

## Job Classifications and Seniority System

Non-managerial employees of T.I.M.E.–D.C. represented by IBT are divided into four basic bargaining units—road (LD), city, garage, and clerical[7]—each with its own separate contract.

The four basic bargaining units each operate under a separate local rider and area supplement although all are covered by the National Master Freight Agreement. Accordingly each maintains its separate seniority roster.

There are generally no lines of progression within the garage. When a vacancy occurs notice is posted and any member of the unit capable of meeting the minimum qualifications for the job may bid on the basis of seniority. The same is essentially true of the city. There is no line of progression and any member of the unit may bid on the basis of seniority on any job within the unit when a vacancy arises, if the employee meets the minimum qualifications.

LD is the only job classification within the line unit. All drivers within the unit are placed on the seniority board. Unit seniority controls the bidding on particular line runs, overtime and protection against layoffs, as well as transfer preference within the Southern Conference under the Modified Seniority plan. (See text accompanying note 9, *infra*). A new LD with low seniority is required to "sweat" the extra board awaiting extra line runs as they arise. As he accumulates seniority he may bid on and obtain the less desirable regular line runs, looking eventually to the day he will have accumulated enough seniority to qualify for the most desirable regular runs.

Nothing in the union contracts prohibits an employee from transferring between separate bargaining units at a given terminal, but he loses his pre-transfer accumulated seniority for bid and layoff.[8]

While city drivers have occasionally and at some terminals frequently transferred to LD, it was a more normal practice for the terminal to hire many of its LDs "off the street".

Ordinarily an employee would not be allowed to transfer from one terminal to another and take his seniority with him. However those terminals within the Southern Conference have adopted a "Modified Seniority System" under which a LD domiciled within the Southern Conference who has been laid off at his home terminal is permitted to use his

---

7. The drivers in the city operations unit pick up freight at the terminal and deliver it locally. They must necessarily drive in congested city traffic and engage in a great deal of loading and unloading.

 Those in the road unit (LDs) drive tractor-trailers over the road between the company's terminals in various cities. They do not load or unload their trailers.

8. The parties stipulated:

 15. If a regularly employed employee not on layoff moves to a job covered by one collective bargaining agreement from a job covered by another collective bargaining agreement at one of T.I.M.E. D.C.'s terminals, it is the uniform policy and practice, in every known instance, that such employee establishes his seniority for purposes of bidding and layoff in the job he transfers to as of the date of the transfer and gives up such seniority for purposes of bidding and layoff in his old job as of that date; however, he maintains his company seniority for purposes of fringe benefits, such as vacation rights.

 Pretrial Order ¶ 15.

unit seniority to either fill a vacancy at another terminal within the Southern Conference or bump a junior LD at such other terminal. Such transfer right must be utilized within 30 days of the layoff. The transferring LD then has the option to return to his old terminal prior to new hirees when a vacancy arises.[9]

### Proceedings Below

The consolidated litigation was tried in the Northern District of Texas in early May 1972. All parties introduced live testimony including that of many alleged discriminatees, supervisory and management personnel of T.I.M.E.–D.C., teamster officers, and various experts including a government statistician and a social psychologist who testified for T.I.M. E.–D.C. In addition the Government introduced over 80 depositions and 19 summaries of depositions taken at 10 of T.I. M.E.'s terminals.

### (1.) Decree In Partial Resolution Of The Suit

Following the trial but before decision, the Government and T.I.M.E.–D.C. entered into a Decree in Partial Resolution of the suit. It stated that it was neither an adjudication on the merits nor an admission by T.I.M.E. of a Title VII violation. It dealt largely with the matter of applicants for new hires. Under the decree T.I.M.E.–D.C. agreed (i) to engage in a minority recruitment program in all communities where it operates terminals in cooperation with community organizations, (ii) to provide all minority applicants who inquire about employment with an application blank and notification of any vacancies, (iii) to keep specific employment records and file periodic reports with the District Court, and (iv) to abide by certain job qualification standards with respect to future hiring and promotion.[10]

---

**9.** In regard to the precise operation of Southern Conference Modified Seniority, the parties stipulated:

 18. The provisions of modified system seniority as provided in the Southern Conference Area Over-The-Road Supplemental Agreement are as follows:
 
 a. The Employer will prepare a seniority roster for all Road Drivers who have seniority under the Road Agreement showing the drivers' full company seniority.
 
 b. Drivers will use company seniority for all purposes at home terminal, but may only move to a foreign terminal when laid off due to reduction in force at home terminal, or at the closing of a domicile point, or in the event of a new point of domicile or as approved by Change of Operation Committee.
 
 c. When a driver has been laid off, he will have a thirty (30) day period in which to exercise his seniority at some other terminal at his option.
 
 d. A driver wishing to exercise his seniority due to layoff, will give advance notice to the terminal manager of the other station; which notice shall be posted on the bulletin board for a forty-eight (48) hour period before a bump is effective.
 
 e. Drivers who have been laid off from their original point of domicile and who have exercised their seniority at some other terminal shall be offered an opportunity to return to that point before new employees are hired.
 
 f. Drivers on lay-off who have not exercised their seniority at some other terminal shall be recalled for work in accordance with the Road Agreement. However, if recall is to a foreign terminal he will have the option of turning down the recall and thereafter, he will be entitled to recall at his home terminal only.
 
 g. Any employees of a company who under the terms of the 1970–73 Contract have voted to have Southern Conference Modified Seniority who did not already have Southern Conference Modified Seniority, and who are on lay-off and who have not had an opportunity to exercise their seniority into the other area will have a thirty (30) day period from the date of the adoption of these rules in which to exercise their seniority over any junior employee in the other area. The thirty (30) day period shall commence September 21, 1970.
 
 h. An employer shall not lay off an employee if the employee averages $150.00 per week for thirty (30) days except as provided in Article 5, Section 4 of the National Master etc. contract, or for a provable economic lay-off.

Pretrial Order ¶ 18.

**10.** With respect to driving positions the decree provided

 *Qualifications for Employment*
 5. The qualifications for city driving and road driving positions shall be those set

Of greater significance to the issues on appeal, the decree mandated priority to discriminatees and subsequently a one-to-one minority-white hiring ratio.[11]

Finally T.I.M.E.–D.C. agreed to pay $89,500.00 in full settlement of its "alleged obligation" to individual and class discriminatees as found by the District Court. The decree provided for a maximum award of $1,500.00 to any individual discriminatee, and any award of monetary compensation would be conditioned on a signed release of any right to future compensation arising out of past discrimination covered by the litigation.

### (2.) The Court's Adjudicative Order And Decree

The Court was then left with the task of determining whether there was a pattern and practice, and if so, which employees were "individual or class discriminatees suffering the present effects of

past discrimination" within the meaning of ¶ 13(a) of the Consent Decree (see note 11, *supra*) and thereby entitled to transfer preference and seniority relief.

*Pattern And Practice Of Discrimination.* The Court reviewed the Government's proof including its statistical evidence which consisted of tables showing the ratio of Blacks to Whites in each Standard Metropolitan Statistical Area (SMSA) and in each T.I.M.E.–D.C. terminal city compared with the ratio of black to white employees at that terminal,[12] and at selected major metropolitan terminals the numerical breakdown by race of each job classification.[13]

The Court concluded on the statistics and live testimony of many witnesses that T.I.M.E.–D.C. has not hired minorities in proportion to their numbers in the various terminals and has not allowed minorities to engage in the choice jobs at the terminals such as LD. In addition,

forth in the Department of Transportation's Motor Carrier Safety Regulations, Title 49, Part 391, Sections 391.11 and 391.15. No black or Spanish-surnamed American applicant for a road driving position who meets these qualifications shall be deemed insufficiently experienced for that position if he has the equivalent of two years experience driving equipment comparable to that to be operated on the job. In determining equivalence, T.I.M.E. D.C. shall consider such factors as military driving experience and graduation from a truck driving school.

\* \* \* \* \* \*

12. T.I.M.E. D.C. may continue to give the Department of Transportation written safety test to all applicants; however, passing the test shall not be a qualification for employment unless the Department of Transportation revises its Motor Carrier Safety Regulations, Title 49, Part 391, to so provide.

11. It prescribed the following procedure for filling future vacancies at the T.I.M.E.–D.C. terminals involved:

13. All job vacancies at T.I.M.E. D.C. terminals and other facilities at which it employs personnel shall be filled in the following sequence:
 (a) By those persons who may be found by the Court, if any, to be individual or class discriminatees suffering the present effects of past discrimination because of

race or national origin prohibited by Title VII of the Civil Rights Act of 1964.

Paragraph 13(a) was expressly adopted in the Court's Final Order, so it became an adjudicative, not just a consent, decree. It further provided that after all individuals covered by ¶ 13(a) have been offered an opportunity to qualify for a LD vacancy at one of the terminals, T.I.M.E. D.C. must then fill future vacancies on a one-to-one minority to white hiring ratio until the terminal reaches the ratio of minority to white employees approximate to that of the city or metropolitan area in which the terminal is located.

12. SMSA is a census bureau term of art. The Government statistics were based on the 1970 United States Census of Population Reports. Background information concerning the compilation of the Government exhibit and the underlying data was provided by a Justice Department statistician who testified at trial. T.I.M.E.–D.C. attacks the reliability and probative values of these comparative statistics.

13. The Government tabulated comparative employment statistics for the 11 terminals at which it took depositions. The statistics were culled from a computer printout of T.I.M.E.–D.C.'s employment records which was introduced into evidence at trial. Therefore the complete comparative racial breakdown at all T.I.M.E.–D.C. terminals was a matter of record and easily computable.

the Court stated that the union contracts while neutral on their face "operate to impede the free transfer of minority groups."

Having found a pattern and practice of discrimination the Court then turned to the question of remedy. Following trial the Government, responding to the Court's request, submitted a list of "Individuals for whom the Plaintiff Seeks Relief" categorizing as an "affected class" of discriminatees those incumbent employees[14] at T.I.M.E.–D.C. terminals that maintained a LD domicile prior to 1969—the approximate date at which T.I.M.E.–D.C. actively began hiring minority group members as LDs.[15]

*Intra-Discriminatee Priorities And Seniority Dates.* On the basis of the evidence submitted by the Government and to some degree countered by the defendants the Court divided the affected class into three groups (referred to as App. A, B, C).

App. A comprised 30 individuals[16] all of whom the District Court concluded "have suffered severe injury because of the practice and plan of discrimination by T.I.M.E. These individuals produced the most convincing evidence of discrimination and harm resulting therefrom."

The Court placed four individuals in App. B because "The evidence regarding these individuals is not sufficient to show clear and convincing specific instances of discrimination or harm resulting therefrom. The evidence does show, however, that these individuals were very possibly the objects of discrimination and that they were likely harmed by such discrimination."

Finally, the Court placed the three hundred plus remaining individuals in App. C since they "either presented no evidence of discrimination against themselves and resulting harm or are no longer in the employ of TIME. As mentioned above, all are members of a class of discriminatees; however, this Court has no evidence to show that these individuals were either harmed or not harmed individually by the discrimination to the class as a whole."

A number of other provisions were significant:

In order to effectuate ¶ 13(a) (see note 11, *supra*) the Court provided that T.I.M.E.–D.C. within a specified period would send notice by certified mail to all in App. A, B and C, informing them of their right to preference on future vacancies at their terminal and of the necessity of affirmatively responding within 60 days if interested.[17] The Court then prescribed specific successively reduced bidding priorities for App. A, B and C and seniority dates on future vacancies[18] as well as a number of other provisions.

---

14. One major exception to the basic definition of the affected class was a group of white employees at the Memphis terminal who were hired into city operations prior to August 8, 1958—the date on which the terminal ceased allowing city drivers to transfer to LD in order to keep Black city drivers from so transferring.

15. Only 20 of T.I.M.E.–D.C.'s 51 terminals were thus included within the Government's request for individual relief.

16. Of the thirty, twenty had either applied initially for the position of LD or had attempted to transfer from city operations to LD and had been turned down. Six were maintenance servicemen at the Nashville terminal discriminatorily denied training needed to advance within the garage. The remaining three had been the subjects of various other forms of discriminatory treatment.

17. Further, failure to respond to T.I.M.E.–D.C.'s notice or failure to accept an opportunity to transfer would be a waiver of the company's obligation to the discriminatee.

18. For *App. A*: those affirmatively responding to the notice would be notified when future vacancies arose at their home terminal in the order of terminal seniority which, if the applicant qualified, could be carried back to July 2, 1965 (the effective date of Title VII), over into the new position regardless of whether it was in a separate bargaining unit governed by a separate contract.

(ii) For *App. B*: after App. A members responding affirmatively to the T.I.M.E.–D.C.'s initial notice have all been offered an opportunity to bid on the position from which they had been excluded at their home terminal, T.I.M.E.–D.C. would then offer an opportunity to

The Court carefully restricted the relief to future vacancies and then determined that a position would not be considered vacant if there was a seniority roster employee on layoff unless the layoff had been in existence for a period of greater than three years. Otherwise, the laid off employee would be given a preference to bid on openings prior to and without competition from the members of the affected class. (See, e. g., note 44, *infra*).

Under the order, transferring members of the affected class had to meet all objective requirements of the new job. And as to driving jobs, the Court specified that members of the affected class would be allowed to demonstrate their driving skill after they familiarize themselves with company equipment. Any such person who failed the T.I.M.E.–D.C. driving test would be permitted to retake it before a neutral examiner.

Transferring discriminatees would be allowed a 30 day probationary period during which they could return to their old job with no seniority loss in the event they were not satisfied with the new job or were unable to qualify.

The Court also found it necessary to alter the Modified Seniority System of the Southern Area Conference (see n. 9, *supra* and p. 323, *infra*). While laid off LDs at Southern Conference terminals would still be allowed to bump junior drivers at other terminals where no vacancy existed at the other terminal, if a vacancy did exist members of the affected class would be permitted to compete with the transferring LD on the basis of employment seniority. Furthermore within the Southern Conference, members of the affected class granted bidding priority on the position of LD would be permitted to bid on LD vacancies at other terminals on the basis of their seniority. However, members of the affected class domiciled at that terminal would still receive first preference to bid on the LD position.

The Court also specifically tailored relief to cover miscellaneous and unique circumstances at individual terminals.[19]

T.I.M.E.–D.C. was required to keep extensive records and make periodic reports to the Court. And both T.I.M.E.–D.C. and IBT were enjoined from "engaging in any act or practice * * which has the purpose or effect of discrimination * * * ".

The Court retained jurisdiction and ordered a stay of the App. C relief pending appeal. None are happy and all appeal —T.I.M.E.–D.C. and IBT on the ground that the record does not support the finding of pattern and practice and that the relief, especially to App. C is inappropriate. IBT and T.I.M.E.–D.C. assert that the locals were indispensable parties.

The Government, on the other hand, supporting the finding of pattern and

---

bid on vacancies to those in App. B employed at that particular terminal with seniority carryback to January 14, 1971 (the filing of the systemwide pattern and practice suit in the Northern District of Texas).

(iii) For *App. C*: on exhaustion of App. B, a terminal would then offer the opportunity to bid on future vacancies to those of App. C at that terminal. Successful transferees of App. C would carry no accumulated seniority into the new unit but would merely have the opportunity to bid on the vacancy before persons not members of the class and the general public.

19. For instance it ordered that the Memphis terminal had complied with the mandate of App. C in view of the fact that as of 1969 it had permitted members of city operations to transfer to LD, taking with them company seniority for fringe benefit purposes.

It also ordered the Nashville terminal to provide adequate training for the black garage servicemen who had previously been discriminatorily denied such training.

In view of the merged seniority rosters at T.I.M.E.–D.C.'s two Los Angeles terminals (Vernon and Montibello) discriminatees at either would be allowed to bid on vacancies at the other reserving a preference for discriminatees at their own terminal however.

practice, attacks the remedy in several respects. The principal attack is centered on the Court's limiting effective bidding rights to the 30 individuals in App. A to the detriment of the few in App. B, and to the flagrant discrimination of the 300 plus discriminatees in App. C. Intertwined with this is the attack on the seniority carry-back for those in App. A to July 2, 1965, the effective date of the Act, to January 14, 1971 for App. B, the date of filing of the District Court suit and to the date, if ever, each transfer into the specified better job for the hundreds in App. C. Complaint is also made of the provision requiring a layoff to continue for three years before a "vacancy" exists for which those in App. A, B and C have successively reduced transfer rights. Finally, the Government objects to the use of an employer-union qualification committee at Nashville and the failure to grant effective transfer rights to Memphis city drivers [20] hired prior to August 8, 1958.

### Indispensable Parties

We must determine whether Teamster locals representing T.I.M.E.–D.C. employees were indispensable parties to this litigation. We conclude that the District Court correctly ruled that they were not.

Under F.R.Civ.P. 19(a) the Court must determine whether a party should be joined "if feasible." Since the remedy in issue in this litigation will have some effect on the bargaining agreements to which the local unions are parties, it would no doubt be proper to join them as parties to the litigation. Since, however, they are scattered across the country, the trial court could conclude that it is not feasible to join them.

Under 19(b) where joinder is not feasible the Court must determine whether "in equity and good conscience" the action should proceed in the absence of the parties in issue or whether it should be dismissed. The District Court was warranted in holding that the litigation could properly proceed in the absence of the various Teamster locals.

Of great significance to the determination to proceed in the absence of the Teamster locals is the major role played by the International both in the process of contract negotiation and in all phases of this litigation. Teamster contracts are negotiated every three years on a nationwide, multi-union, multi-employer basis with each individual local giving the National Over-The-Road and City Cartage Policy and Negotiating Committee a power of attorney to negotiate on its behalf.[21]

While the National Master Freight and applicable Area Supplement will be included in the contract which the local eventually signs with the employer, both the national and area contracts are subject to acceptance by a nationwide majority vote of Teamsters, thus the members of an individual local will be bound by its provisions even if the majority of the members of the particular local votes to reject it. The process of negotiation shows that the individual locals play little if any role in the actual negotiation of the contracts which control Teamsters' seniority rights and further, that officers of the International are in a position to play a major role in that negotiation.

On the basis of these circumstances other courts which have been faced with the same issue in Title VII litigation in the trucking industry have also concluded that where the International is a party to the litigation, the individual locals will not be regarded as indispensable.[22]

Finally, the basic seniority issue in this case—whether a discriminatee should be

---

**20.** These are included in App. C.

**21.** See Rodriguez, *supra,* at 60, for a more detailed description of the contract negotiating process.

**22.** *Pilot Freight, supra,* 54 F.R.D. at 522; *Navajo Freight, supra,* 4 FEP cases at 1045; *see also* United States v. Roadway Express, *supra,* at 857. *Cf.* Sabala v. Western Gillette, Inc., S.D.Tex., 1973, 362 F.Supp. 1142, 1153–55.

allowed to transfer from city operations to LD (and thus from one contract to another) with full carry-over terminal seniority—is neither specifically prohibited nor even addressed by the contracts before the Court, and certainly not that of local supplements. See *Pilot Freight, supra,* 54 F.R.D. at 521–22.

In view of all the circumstances we conclude that both below and here the International more than adequately represents and defends the seniority status of its members and that adequate and effective relief may be granted without unduly prejudicing the absent local unions, since they too are under the law and cannot shield continued discrimination by contract terms.

*Pattern and Practice*[28]

Graphic statistics led the District Court to conclude that minorities have simply been denied access to the more desirable job of LD. As of March 31, 1971, T.I.M.E.–D.C. had approximately 6,472 employees. Of those, 314 (5%) were Black and 257 (4%) were Spanish-surnamed American. A large majority of the Black and SSA employees were assigned to city operation (city driver, dockman, hostler) or serviceman (including tireman) jobs. Of the Black employees, 260 or 83% were in such jobs. Of the SSA employees, 199 or 78% were in such jobs.

In contrast to this, of the 1,828 LDs as of March 31, 1971, only 8 (or 0.4%) were

23. Although T.I.M.E.–D.C. operates 51 terminals, principal relief for minority members was sought for those employed at the following 20 terminals where line drivers were domiciled prior to 1969—the approximate date when T.I.M.E.–D.C. began hiring and promoting minority members to LD:

T.I.M.E.–D.C. Terminals At Which The United States Seeks Class Relief

| Terminals Where Depositions Taken | | | Others | | |
|---|---|---|---|---|---|
| Terminal | Prior System & Date of Merger into T.I.M.E. | Teamsters Area Conference | Terminal | Prior System & Date of Merger into T.I.M.E. | Teamsters Area Conference |
| Vernon (L.A.) | SW 52 / OCA 54 / C 67 / DC 69 | W | Lubbock | Ic 48 / OCA 54 | S |
| Oklahoma City | OCA 54 | S | Phoenix | SW 52 / DC 69 | W |
| Memphis | SE 57 | S | St. Louis | SE 57 / PB 59 / SS 64 / DC 69 | C |
| Atlanta | SE 57 | S | Paris | SE 57 | S |
| Chicago | SS 64 / DC 69 | C | Chattanooga | " | S |
| Nashville | SE 57 / SS 64 | S | Cincinnati | " | C |
| Irving | TA 68 | S | Kansas City | PB 59 / DC 69 | C |
| San Antonio | TA 68 | S | Knoxville | SS 64 | S |
| Montebello (L.A.) | Lasme 69 | W | Seattle | Lasme 69 / DC 69 | W |
| Hayward (S.F.) | C 67 / Lasme 69 | W | Portland | Lasme 69 / DC 69 | W |
| Denver | DC 69 | W | | | |

Key

Ic—Intercity Motor Express
T—T.I.M.E., Inc.
SW—Southwestern Truck Lines
OCA—Oklahoma City Authority
H—Harrington Truck Lines
SE—Southeastern Truck Lines
S—Southern Area Conference
W—Western Area Conference
C—Central Area Conference

PB—Powell Brothers Truck Lines
SS—Sup. Service Motor Freight, Inc.
C—Constructors Transport Co.
Lasme—Los Angeles-Seattle Motor Express
DC—DC International

Black and only 5 (or 0.3%) were SSAs. None of the eight Blacks were employed as a line driver until 1969, even though the Government's Title VII suit with respect to the Nashville terminal had been filed on May 15, 1968. Of the eight Black LDs, three were transferred city drivers at Memphis, two in 1969 and one in 1970; of the other five, one was hired in Evansville, Indiana in 1969 and the others were hired in Cincinnati, St. Louis and Oklahoma City in 1970. Of the five SSA LDs, three were employed at El Paso in 1950, 1966 and 1969 respectively, and two were employed at Los Angeles in 1963. So glaring was the situation that with the exception of one Black who worked as a LD at the Chicago terminal from 1950 to 1959, there is no evidence that a single Black was ever employed on a regular basis as LD by T.I. M.E.–D.C. or any of its predecessor companies prior to 1969.[24]

Similar facts were starkly revealed as to minority discrimination at the Nash-

24. Systemwide Job Classification * Statistics for the T.I.M.E.–D.C. system as of March 31, 1971:

| JOB CATEGORY | Total | White | Negro | SSA | Am. Ind. | Orien- tal |
|---|---|---|---|---|---|---|
| Apprentice Mechanic | 4 | 3 | | 1 | | |
| City Drivers | | | | | | |
| City Heavy Duty Dr. | 419 | 362 | 22 | 32 | 1 | 2 |
| City Pud Dr. | 874 | 755 | 57 | 56 | 5 | 1 |
| Dockmen | | | | | | |
| Dockmen | 1135 | 932 | 107 | 85 | 7 | 4 |
| Swamper | 1 | 1 | | | | |
| Hostler | 117 | 102 | 9 | 5 | 1 | |
| Janitor | | | | | | |
| Janitor–Shop | 2 | | 2 | | | |
| Janitor– Terminal | 26 | 11 | 12 | 3 | | |
| Line Driver | 1828 | 1802 | 8 | 5 | 12 | 1 |
| Mechanic | 325 | 297 | 11 | 12 | 5 | |
| Mechanic Helper | 11 | 9 | | | 2 | |
| Shopmen | | | | | | |
| Partsmen | 29 | 26 | 2 | 1 | | |
| Servicemen | 156 | 80 | 57 | 19 | | |
| Tiremen | 23 | 12 | 8 | 2 | 1 | |

3/31/71 Pre-Trial stipulation 14.

* The table shows statistics for only those job classifications relevant to the issues on appeal. Omitted are office and supervisory positions.

ville [25] and Memphis terminals. There is no evidence that Blacks were employed on a regular basis in any job other than serviceman until April 15, 1968 at Nashville. Mechanics, partsmen and servicemen are now on a common seniority roster, but until May 27, 1971 they were on three separate seniority rosters. The Southern Conference Area Supplemental Agreement effective April 1, 1970 now permits servicemen to bid on and move to mechanic jobs (and partsman jobs) and retain their seniority. However, the Agreement adds a new requirement. Servicemen may bid on and move to mechanic and partsman jobs only if they have "previously qualified" for those jobs under rules established by an employer-union qualification committee.

At Memphis [26] the first transfer of a Black from city operation to LD was in July 1969. It was here where the Government asserted and the District Court impliedly found the anti-Black policy produced an anomalous injury to White city drivers when in 1958 the company abandoned its practice of allowing White city drivers to make extra LD trips.

On the other hand, and to its great credit, T.I.M.E.–D.C. in December 1968, adopted a policy at the Memphis terminal of offering vacancies in LD jobs to qualified city employees before filling these jobs with persons "off the street." And although seniority for fringe benefits can be carried over from city to LD, such transferring city employees may not use their accrued seniority for bidding and layoff purposes as LDs.

Statistics, however, of this kind and intensity are not only significant, they may often be dispositive especially in a pattern and practice claim. As we pointed out in Rowe v. General Motors Corp., 5 Cir., 1972, 457 F.2d 348, 358:

figures of this kind, while not necessarily satisfying the whole case, have critical, if not decisive, significance—certainly, at least in putting on the employer the operational burden of demonstrating why, on acceptable reasons, the apparent disparity is not the real one.

This synthesizes the many holdings of this and other Courts,[27] the latest of which are the trilogy of Rodriguez v.

---

**25.** See as of March 31, 1971, the employee complement by race:

| | Total | White | Black |
|---|---|---|---|
| Line Driver | 74 | 74 | 0 |
| City Operation | | | |
| City Driver | 31 | 31 | 0 |
| Dockman | 70 | 70 | 0 |
| Hostler | 6 | 6 | 0 |
| Shop | | | |
| Mechanic | 30 | 28 | 2 |
| Partsman | 3 | 3 | 0 |
| Serviceman (including Tireman) | 29 | 10 | 19 |

The first Black ever hired as a regular mechanic at the terminal was employed on April 15, 1968, approximately a month before the Government's suit was filed. The first Black ever hired as a regular dockman at the terminal was employed on September 1, 1969.

**26.** See as of March 31, 1971, the employee complement by race:

| | Total | White | Black |
|---|---|---|---|
| Line Driver | 104 | 101 | 3 |
| City Operation | | | |
| City Driver | 35 | 24 | 11 |
| Dockman (Checker) | 112 | 89 | 23 |
| Hostler | 8 | 6 | 2 |

Line Drivers and city operation employees are on separate seniority rosters.

**27.** See also Franks, *supra,* at 419; Pettway v. American Cast Iron Pipe Co., 5 Cir., 1974, 494 F.2d 211 at 225, note 34; Johnson v. Goodyear Tire & Rubber Co., 5 Cir., 1974, 491 F.2d 1364, 1371–73; Morrow v. Crisler, 5 Cir. (en banc), 1974, 491 F.2d 1053, 1055; United States v. Hayes International Corp., 5 Cir., 1972, 456 F.2d 112, 120 (Hayes II); Burns v. Thiokol Chemical Corp., 5 Cir., 1973, 483 F.2d 300, 305; United States v. Jacksonville Terminal Co., 5 Cir., 1971, 451 F.2d 418, 424–36 and 441–442, *cert. denied,* 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); United States v. Hayes International Corp., 5 Cir., 1969, 415 F.2d 1038, 1043 (Hayes I); Bing (I), *supra,* at 689; Witherspoon v. Mercury Freight Lines,

East Texas Motor Freight, 5 Cir., 1974, 505 F.2d 40; Herrera v. Yellow Freight System, Inc., 5 Cir., 1974, 505 F.2d 66; and Resendis v. Lee Way Motor Freight, Inc., 5 Cir., 1974, 505 F.2d 69, which for this very industry and employment practices eliminates all doubts of the decisive significance of flagrant statistical deviations.

But the Government did not stop there. It buttressed its statistical evidence with a massive amount of testimony presented by live witnesses as well as by depositions taken at 10 of the major T.I.M.E.–D.C. terminals reflecting that members of these minority groups with substantial amounts of driving experience had frequently applied initially for and been rejected for the position of LD, and that a substantial number of such qualified persons employed in the city operations unit at each of the 10 terminals had sought and been refused transfer to LD.

Although, with the exception of Memphis (1958–68), there may not have been an explicit no-transfer rule from city to LD the evidence showed a reason in addition to purposeful refusal to hire or transfer minorities. This was the seniority system that prohibited the carry-over of seniority from city to LD for layoff and bidding purposes. Thus the minority employees were locked-in to the positions where they were initially discriminatorily assigned since they would be forced to forfeit their extensive accumulated seniority for bidding and layoff purposes upon transfer to the road.

Of course this practice has been roundly condemned.[28] In *Franks, supra,* at 414 we recently pointed out:

> Though not as drastic as a rigid no-transfer rule, a departmental seniority system discourages transfers and thereby locks a discriminatee into his inferior job by threatening him with loss of his accumulated seniority if he should transfer.

And again this is echoed in stronger terms in *Rodriguez, supra,* at 53, 60, 61. And the pudding's proof being in the eating, this record furnishes fresh confirmation of the wisdom of our declaration in *United States v. Jacksonville Terminal, supra,* at 453 that in "any industry loss of seniority is a critical inhibition to transfer".

### Attack Of T.I.M.E.–D.C. And IBT On Evidence

The defendants mount an attack on that portion of the plaintiffs' statistical evidence that compares the proportion of Blacks in the city or Standard Metropolitan Statistical Area (SMSA), where T.I.M.E.–D.C. operates terminals with the proportion of Blacks employed at those terminals. They complain that the SMSA has not been properly defined, and thus it is impossible for them to

---

*supra,* at 498; Brown v. Gaston County Dyeing Machine Co., 4 Cir., 1972, 457 F.2d 1377, 1382, *cert. denied,* 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246; United States v. N. L. Industries, Inc., 8 Cir., 1973, 479 F.2d 354, 368–70; Carter v. Gallagher, 8 Cir. (en banc), 1971, 452 F.2d 315, 321, *cert. denied,* 1972, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338; United States v. Carpenter's Local 169, 7 Cir., 1972, 457 F.2d 210, 214; Parham v. Southwestern Bell Telephone Co., 8 Cir., 1970, 433 F.2d 421; Jones v. Lee Way Motor Freight, *supra,* at 247; Stamps v. Detroit Edison Co., 1973, E.D.Mich., 365 F.Supp. 87, 110; United States v. Central Motor Lines, Inc., *supra,* at 556; United States v. Navajo Freight Lines, *supra,* 6 FEP at 294; United States v. Pilot Freight Carriers, Inc., *supra,* 54 F.R.D. at 522.

**28.** See United States v. Pilot Freight, *supra,* 54 F.R.D. at 522, United States v. Navajo Freight, *supra,* 6 FEP at 276, United States v. Central Motor Lines, *supra,* at 539, 552, 557. The same principle has been recognized in other industries as well. N. L. Industries, *supra,* at 364; United States v. Bethlehem Steel Corp., 2 Cir., 1971, 446 F.2d 652.

The Eighth Circuit only recently observed that:

> The price that the existing seniority plan extracts from the pre-1963 employees for the opportunity to break out of a department to which they were racially assigned is too high, expecially since it is to be paid by the same group that has already endured the hardships of past discriminatory practices.

N. L. Industries, *supra,* at 364.

attempt to rebut the statistics. But the inability to rebut came not from lack of an informed standard. Rather, in most instances for LDs, the inability came from the inexorable zero.[29]

■ Both as to statistical and testimonial evidence they urge that the evidence of particular incidents of discrimination are too few, too concentrated at certain terminals, and too remote in time to establish a systemwide pattern and practice of employment discrimination. We cannot agree. The plaintiff produced evidence of over 40 specific instances of discrimination spread throughout the system of T.I.M.E.–D.C.—instances often egregious and viewed as a whole quite definitely supporting the finding that the pattern and practice of discrimination literally occurred. The terminals at which the Government took depositions are spread throughout the entire T.I.M. E.–D.C. system and for the most part contain the largest LD operations within the system.[30]

■ On remoteness, the complaint is that the incidents and figures go back too far, some as early as 1957. But for Title VII the past is indeed prologue. We agree with the Fourth Circuit, United States v. Dillon Supply Company, 1970, 429 F.2d 800, 804, that proof is permissible of any "past specific or general act, practice, policy or pattern of racial discrimination which the proof showed had any present discriminatory effect" and thus should be considered by the trial court in such a case.

■ Under Title VII proof of pre-Act discrimination is always relevant where the present seniority system perpetuates past discrimination. Goodyear, supra, at 1374; Local 189 Papermakers v. United States, 5 Cir., 416 F.2d 980 at 988;

Quarles v. Philip Morris, Inc., E.D.Va., 1968, 279 F.Supp. 505, 516. In *Jacksonville Terminal, supra,* at 450, we pointed out that "when seniority becomes an issue * * * the past becomes more important."

■ The Court was not compelled to credit the contention that there were no openings for LD at the time the Blacks applied or sought transfer, or that the applicants failed in filling out forms or seeking the right person. And considering the overpowering prima facie case of pattern and practice the trial court at the liability stage was not required to sustain the counterattack on the testimony of individual discriminatees as to credibility, availability or qualification. As we observed in *Hayes* (II), *supra,* at 120.

The inference arises from the statistics themselves and no other evidence is required to support the inference. At this stage of the proceedings it was not necessary for the Attorney General to show the availability of skilled negroes in the community to perform the jobs in question because the burden of going forward and showing the lack of qualified negroes was upon Hayes. This burden is not met by Hayes' attempts to parry specific allegations of alleged discrimination, e. g., the four negroes rejected after failing a typing test and the one turned away for being overweight, or by company officials stating in general terms that no one was refused employment solely because of their race.

■ Finally, we reject the attempt to discredit the testimonial evidence introduced by the Government or the trial court's conclusions by subjecting them to the analytical steps delineated by the

---

**29.** For example, Atlanta with SMSA ratio 77.41% White, 22.35% Negro and a city ratio of 48.40 W, 51.31 N, had 57 White LDs and no Negro; Dallas with SMSA of 83.23 W, 15.98 N, city 74.15 W, 24.91 N, had 20 LDs all White, none Black; Los Angeles with SMSA 85.42 W, 10.84 N, city 77.19 W, 17.88 N, had at LAX and LOS 374 LDs, all but two being White. (See Appendix A to District Court's opinion).

**30.** Seven of the ten largest LD operations are located at the ten terminals where depositions were taken. Eleven hundred seventy one LDs are domiciled at the terminals where depositions were taken as opposed to 358 at those terminals where no depositions were taken.

recent case of *McDonnell Douglas Corporation v. Green,* 1973, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. Both due to its own peculiar factual setting and by its own explicit terms *McDonnell Douglas* is inapplicable to a pattern and practice suit such as the one before us. We dispose of this as we did in *Rodriquez, supra,* at 55–56.

### Good Intentions And Recent Improvement

Both T.I.M.E.–D.C. and IBT urge that the pattern and practice finding should not have been made, and that in any event progress by each is such that no mandatory relief was either appropriate or justified.

 T.I.M.E.–D.C.'s recent minority hiring progress stands as a laudable good faith effort to eradicate the effects of past discrimination in the area of hiring and initial assignment.[31] But it is not enough to eradicate the effects of the past discrimination against incumbent minority group members who are presently locked into the positions to which they were initially and discriminatorily assigned. We sounded this note in *Rowe, supra,* at 355

the problem is not whether the employer has willingly—yea, even enthusiastically—taken steps to eliminate what it recognizes to be traces or consequences of its prior pre-Act segregation practices. Rather, the question is whether on this record—and despite the efforts toward conscientious fulfillment—the employer still has prac-

tices which violate the Act. In this sense, the question is whether the employer has done enough.

See also Griggs v. Duke Power Co., 401 U.S. 424 at 432, 91 S.Ct. 849 at 854, 28 L.Ed.2d 158 at 164–65; *Franks, supra,* at 418; Local 53, Asbestos Workers v. Vogler, 5 Cir., 1969, 407 F.2d 1047, 1055; *N. L. Industries, supra,* at 361; Cypress v. Newport News General and Nonsectarian Hospital Assn., 4 Cir. (en banc), 1967, 375 F.2d 648, 658. The Judge was entitled to consider the fact that the significant improvements in T.I.M.E.–D.C.'s employment patterns have occurred subsequent to the initiation of the 1968 Nashville litigation long after the effective date of Title VII. See *Goodyear, supra,* at 1376, n. 36; Jenkins v. United Gas Corp., 5 Cir., 1968, 400 F.2d 28, 33.

IBT likewise emphasizes the Union's efforts to eradicate past discrimination. They point out that in 1970 Article 38, a non-discrimination clause was added to the National Master Freight agreement.[32]

 But as with the employer, the issue is not simply what has been done but whether what has been done is enough. Of course, a union is responsible when the seniority system created by its contract perpetuates the effects of past discrimination. See *Goodyear, supra,* at 1381; Robinson v. Lorillard Corp., 4 Cir., 1971, 444 F.2d 791; United States v. St. Louis and San Francisco R.R., 8 Cir., 1972, 464 F.2d 301.

Our careful consideration of the record has convinced us that despite their vigor-

---

**31.** According to the statistics introduced by the defendants in the company's periodic reports to the District Court, total number of minorities employed increased from 7.1% in 1967 to 10.5% in 1972, and to 13% in 1973. During 1971, 16.9% of new hires were members of minority groups and during the first six months of 1973, 72 out of 113 new hires, or 64%, were minority group members. Likewise, during the first six months of 1973, 29 of 95 LDs or 30% belonged to minority groups. Presumably, of course, the 1973 statistics reflected the one-to-one hiring ratio provided by the court-approved consent decree.

**32.** ARTICLE 38.

Non-Discrimination

The Employer and the Union agree not to discriminate against any individual with respect to his hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, sex, or national origin, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of his race, color, religion, sex, or national origin.

ous attempt, the District Court was entitled to conclude that the defendants have failed to rebut the plaintiffs' prima facie case of employment discrimination. Accordingly the District Court correctly concluded that the defendants have engaged in an extensive pattern of employment practices unlawful under Title VII and that strong remedial action is warranted.

### The Remedy

*The Affected Class.* The Court defined the affected class broadly as all incumbent[33] minority employees who had been hired during the period in which T.I.M.E.–D.C. was engaged in discriminatory assignment and transfer practices. The Court then measurably narrowed the class by the successively declining bidding preference rights to those in App. A, App. B and App. C with similar declining dates of carry-over seniority.

### Rightful Place

◼◼◼ As this bears on all the relief to be accorded on the reexamination upon

---

**33.** As the Government's brief (p. 41, n. 80) points out the District Court granted retroactive seniority (to the date of their application) for some of the rejected applicants for new hire, and did not for others. This appeal does not pertain to that issue, but is concerned only with the rights of incumbent employees who are members of the affected class.

But since the affected class has to be reexamined to eliminate the disparities between App. A, App. B and App. C, the District Court has to have great flexibility on remand to consider former applicants who never became incumbents. The priorities granted to such former applicants under App. A or App. B may have to give way as will carry-over seniority dates, since we have rejected the notion of super seniority. In Franks v. Bowman Transp. Co., 5 Cir., 1974, 495 F.2d 398, 417, *rehearing en banc denied*, 5 Cir., 1974, 500 F.2d 1184, *cert. denied*, 420 U.S. 989, 95 S.Ct. 1421, 43 L.Ed.2d 669 (1974), we have recently observed that

In seeking application-date seniority for members of class 3 (black applicants who applied for OTR jobs before January 1, 1972) appellants ask us to take a giant step beyond permitting job competition on the basis of company seniority. They ask us to create constructive seniority for applicants who

remand, we emphasize without repetition each time the doctrine of rightful place. We put it this way in *Rodriguez, supra,* at 61–62:

We have long subscribed in this circuit to the theory that those who suffer discrimination under Title VII must be permitted to take their "rightful place" when job openings develop. As we said in *Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d [980] at 988:*

The Act should be construed to prohibit the *future* awarding of vacant jobs on the basis of a seniority system that "locks in" prior racial classification. White incumbent workers should not be bumped out of their *present* positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation.

See Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260 (1967). Thus, black

---

have never worked for the company. Granting that the black OTR applicants who were rejected on racial grounds suffered a wrong, we do not believe that Title VII permits the extension of constructive seniority to them as a remedy.

The District Court specifically described App. C as those individuals either for whom no evidence was offered, or who were no longer employed by the Company. So it would seem that all former employees and rejected applicants should literally have been included in App. C. On appeal, however, the Government disclaims any attempt to seek review of the District Court's failure to grant individual relief to the rejected applicants or former employees in App. C. The issue then is really not before us as to these applicants for jobs who were not incumbents.

But in any event, we would caution all parties that the citing of *Franks* is merely the repetition of the current state of the law in the Fifth Circuit. Certiorari has recently been granted by the Supreme Court on *Franks* and of course all wait with baited breath for the outcome produced by the great people east of the Potomac River. The flexibility we have given the District Court on remand is elastic enough to accommodate whatever wisdom will come from the Highest Court.

and Mexican-American city drivers, many of whom would now be road drivers but for the discrimination of the defendants, must be given an opportunity to transfer to the road as road driving job openings develop.

See also *Franks, supra*, at 416; *Pettway, supra*, at 222–25; Bing (II) v. Roadway Express, Inc., 5 Cir., 485 F.2d 441 at 450; *Jacksonville Terminal, supra*, at 452–53; *189 Paperworkers, supra*, at 988; *Bethlehem Steel, supra*, at 658–61.

The purpose of seniority carry-over under the rightful place doctrine is to give the discriminatee the incentive to transfer by removing the major disincentive to such transfer (loss of accumulated seniority). It also gives the discriminatee enough seniority in the new unit to permit effective competition for advancement and to provide the protection against the threat of layoff to which the discriminatee would be exposed because of the initial discrimination. *Bethlehem Steel, supra*, at 660; *Bing (II), supra*, at 450; *Local 189 Papermakers, supra*, at 988.

### Qualification Date

██ As with "rightful place," just discussed, this too is a recurring factor which has to be taken into account as relief is accorded on the remand. Again in *Rodriguez, supra*, at 63, we pointed out that "in *Bing* we approved a 'qualification date' formulation—the date a transferee had the experience necessary to qualify him for a road driving job. 485 F.2d at 451."

In describing its operations we rejected the recent criticism of this rule by the

Sixth Circuit as made in Thornton v. East Texas Motor Freight, 6 Cir., 1974, 497 F.2d 416. *Rodriguez*, 505 F.2d at 64.

Since there was no uniform system-wide driver experience requirement we do not undertake to blueprint what the qualification date may or should be for LDs or other jobs from which Blacks and SSAs have been excluded.[34] The evidence on remand may justify some non-uniformity so long as the standard laid down meets the test of *Rodriguez*.[35]

*Descending Priority—App. A, App. B, App. C.* The District Court prescribed three classes of discriminatees, App. A, App. B, App. C, and gave to those in App. A first priority for bidding (and layoff) to be followed next by the few in App. B and the remaining some 300 were put in App. C. Equally important were the declining carry-over seniority dates—those in App. A the effective date of Title VII (July 2, 1965), in App. B the date of the filing of the Texas suit (January 14, 1971), and lastly for App. C the date a discriminatee qualified for and obtained the new position.

The classification was made on the basis of the showing of relative prejudice. For those in App. A the live testimony (in Court or by deposition) showed positive discrimination and prejudice. Those in App. B likely suffered but the demonstration was not so positive. As to those in App. C the Court's final order held that although "all are members of a class of discriminatees" there was "either—no evidence presented of discrimination against—" them "or they are no longer employed by T.I.M.E."

---

**34.** Since the discrimination has been in denying minorities the opportunity to take tests, etc. for transfer to LDs, for example, the "Qualification Date" is not limited to the date on which the class member is finally allowed to take the test pursuant to the Court's decree. It may, and often will, be fixed at the date in the past on which the person was in fact qualified had he been given the opportunity to establish it.

**35.** See, e. g., 505 F.2d at 63 n. 29 and 64 n. 30. The Government recognizes it may vary. See, e. g., Atlanta limiting seniority to August 1, 1958, the date on which LD positions for Whites or Blacks was established at that terminal.

In the Supplemental Opinion, the District Court also ordered included in App. C those White employees hired into city operation jobs at the Memphis terminal before August 8, 1958 who had not yet transferred to LD as of that date (Supp.Op., p. 2, para. III, I).

■ It is clear that the Judge thought that there had to be proof of individualized discrimination and prejudice. This misconceives both the purpose and procedural structure of a pattern and practice suit (see note 3, *supra*). Congress circumscribed the circumstances in which the heavy power of the Government through the Attorney General could enter the lists. To trigger the suit discrimination may not be merely isolated, sporadic, or non-repetitive. United States v. Iron Workers, Local 86, 443 F.2d 544, 552, *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367; United States v. Mayton, 5 Cir., 1964, 335 F.2d 153, 159; United States v. Ramsey, 5 Cir., 1964, 331 F.2d 824, 837; Jacksonville Terminal Co., *supra*, at 441.

To permit the Court to grant any relief it must find pattern and practice. The proof through statistics and live swearers is directed toward that principal issue plus, in a more general sense, facts bearing on the nature, kind and extent of the relief which is either appropriate or required. It would be contrary to a claim of this structure to have to offer testimony concerning every member of the affected class. By its very nature it is a kind of class action maintained by the sovereign to vindicate the rights of the whole class.[36]

With the pattern and practice established to the satisfaction of the Judge, it would defy reason and waste precious judicial resources for the Court either to require or permit individualized proof for every member of a class here numbering nearly 400 but frequently involving thousands for whom effective relief could not be achieved were we to approve the approach of the District Court here. Whatever evidentiary hearings are required for individuals can well be postponed to the remedy.

■ The result is that we cannot accept the gradations of App. A, App. B, and App. C. For all we know, at this stage some on App. C may have suffered discriminations even more egregious than those whom the Government singled out to be persuasive witnesses to establish pattern and practice. All those on App. A, App. B and App. C are entitled to be given an opportunity to bid on future vacancies in the specified job classifications to which they are allowed to transfer by the District Court's order on the basis of their seniority and, if they qualify for those jobs, to be permitted to exercise their full seniority in such jobs for all purposes, including bidding and layoff.[37]

We believe that such a bidding procedure is designed to eradicate the present effects of past discrimination by permitting all members of the affected class rather than just a selected few to have the opportunity to advance to the positions that they might have achieved in the absence of racial discrimination.

As is true of the relief mechanism of the District Court's order, such a bidding procedure provides all members of the affected class at a *given terminal* the opportunity to bid on a vacancy in the LD position prior to persons who are not a member of the affected class, whether incumbent employees or otherwise.

■ Nor does this bidding procedure amount to reverse discrimination in violation of § 703(j) of the Act.[38] It is now

---

**36.** Of course they are not identical. *Rodriguez, supra*, at 66, points out some distinctions between private plaintiffs' class actions and a Government pattern and practice suit, particularly as to the interests to be served.

**37.** Those who have already moved to vacancies in such job classifications will be permitted to exercise their full seniority in those jobs and likewise for all purposes.

**38.** 42 U.S.C.A. § 2000e–2

(j) Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on

well established that granting the first opportunity to bid on future vacancies to members of such an affected class is a permissible, and in some instances essential, remedy where it is necessary to effectively eradicate the present effects of past discrimination. See *Bing (II), supra,* at 485; *Franks, supra,* at 413; *Vogler, supra,* at 1054; *Pettway, supra* at 248. Indeed, in the discriminatory hiring context preferential treatment in the form of temporary quota relief has frequently been ordained by the courts.[39]

### App. A, App. B, and App. C Seniority Carry-Over Dates

Tied into the App. A, App. B and App. C descending priorities for bidding and layoff purposes was a similar tri-part decline in seniority carry-over dates. We find none of them acceptable.

■ To the most favored group (App. A) the date fixed was the effective date of the Act (July 2, 1965). But under the rightful place theory members of the affected class of discriminatees have regularly been allowed to use full seniority to bid on vacancies and to continue to use it for bidding and layoff purposes in the new position. *Franks, supra,* at 416; *Pettway, supra,* at 248; *Jacksonville Terminal, supra,* at 454; *Quarles, supra,* at 521. And that includes *full* seniority even though it may extend back beyond the "effective date" of Title VII since seniority provisions that call for the for-

feiture of accumulated seniority on transfer serve to *presently* perpetuate the effects of pre-Act discrimination. *Bing (II), supra,* at 451; *Jacksonville Terminal, supra,* at 454; *Bethlehem Steel, supra,* at 666. Indeed, there is no precedent we are aware of which limits carry-over seniority to the effective date of the Act.

■ The App. B limitation to the date of filing of the Texas suit (January 14, 1971) fares no better. First, it now flies in the teeth of *Rodriguez* in which we reiterated the qualification date principle despite the Sixth Circuit's criticism and use of the date of application for transfer or of filing an EEOC charge. 505 F.2d at 64. Next, it ignores the accepted principle that where there has been a showing of classwide discriminatory practices coupled with a seniority system that tends to freeze or perpetuate the effects of that discrimination, a member of the affected class need not actually show that he or she unsuccessfully attempted to transfer to the excluded position. *Bing (II), supra,* at 451; *Bing (I), supra,* at 689; *N. L. Industries, supra,* at 369; *Leeway Motor Freight, supra,* at 247; *Cyprus, supra,* at 653; *Pilot Freight, supra,* at 522.

The Courts have as a practical matter recognized that a member of the affected class may well have concluded that an application for transfer to an all White position such as LD was not worth the candle.[40]

account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

**39.** See *Morrow, supra,* at 1056; NAACP v. Allen, 5 Cir., 1974, 493 F.2d 614; Carter v. Gal-

lagher, 8 Cir. (en banc), 1971, 452 F.2d 315, *cert. denied,* 1972, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338; United States v. Wood, Wire & Metal Lathers Local No. 46, 2 Cir., 1973, 471 F.2d 408, 413, *cert. denied,* 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398; United States v. Ironworkers, Local 86, 9 Cir., 443 F.2d 544, 553–54, *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367; Vulcan Society v. Civil Service Commission, 2 Cir., 1973, 490 F.2d 387, 399; Bridgeport Guard Inc. v. Members of Bridgeport Civil Service Commission, 2 Cir., 1973, 482 F.2d 1333, 1340–41.

**40.** In *Bing (II), supra,* at 451, we recently noted that

If an employee realizes full well that blacks simply are not hired as road drivers,

And, of course, the App. C limitation to the date the class member somehow succeeds to a vacancy is worse. Aside from the fact that this exposes App. C members to discrimination at the hands of their fellow victims (App. A and App. B), it means for practical purposes that the discrimination in favor of Whites continues.

This means that for all members of the class there should be full company employment seniority carry-over for bidding and layoff purposes, subject of course to the proper application of the qualification date principle (see n. 35, *supra* and related text). On remand and after appropriate evidentiary hearings the District Court's decree must be suitably modified to eliminate the prescribed priorities, the prescribed seniority dates, and the prescribed differences therein, as between those in App. A, App. B and App. C.[41]

### Individual Relief

We do not think it necessary for the trial court to reexamine the findings as to the discrimination against those in App. A or App. B and the prejudice suffered by each. But as the A, B, C priorities and their distinctive seniority dates are now eliminated, the employment position of each may be affected and call for further adjustment.

■ Although not attacked here as such (see note 33, *supra* ), since the trial court must make a basic reexamination to assure that all members of the affected class benefit in the relief we prescribe, we recognize that there may be need for two things. The first is an evidentiary exploration of the distinction between incumbents, former employees and applicants who were never hired. Second, there should be a legal determination consistent with all our cases concerning relative relief (including bidding priorities and seniority dates) appropriate to each.[42]

### Nashville Servicemen

■ The District Court ordered that proper training should be provided for the six Nashville Black servicemen (included in App. A) for whom there was specific evidence in the record of exclusion from the city operations and mechanic and partsman classifications, and that they be allowed to bid on future vacancies in the classifications of dockmen, partsman, and mechanic and if qualified should be permitted to carry over seniority as of July 2, 1965, the effective date of the Act. We approve the District Court's remedial action but modify it in several respects. First, the July 2, 1965 date is out and full employment seniority as discussed generally will apply. Next, the training transfer remedy prescribed by the District Court should apply to *all* Blacks hired into the serviceman classification at the Nashville terminal prior to 1969 [43] (the date when the first Black was hired as a regular dockman in Nashville). Of course as to all others, servicemen are entitled, on qualification, to bid for LD with appropriate seniority.

The Government has one further objection. The 1970 union contract abolished the requirement that servicemen at the Nashville terminal were required to forfeit accumulated seniority in order to transfer to the mechanic or partsman's

---

why should he bother to apply? Certainly a few, such as Bing, have the courage to fight "the system," but it is equally certain that others must have been intimidated and discouraged by Roadway's discriminatory practices.

**41.** According to the District Court's decree, the seniority date allowed App. A was July 2, 1965, the effective date of Title VII, except for those who were employed later.

**42.** Of the 30 in App. A, 20 of these are incumbents excluded from LDs. Of the remaining 18 covered by specific testimony, 9 were former employees, 2 of whom were put in App. A, 1 in App. B, and the balance in App. C together with all rejected applicants.

**43.** The other 10 were included in App. C.

classification. However, the new contract provided that transferees would be required to qualify for the positions on the basis of requirements set forth by an employer-union committee.

 The United States argues that the new employer-union committee violates Title VII in that it imposes a new and more stringent requirement on Blacks now seeking to transfer from serviceman to mechanic or partsman than was imposed on Whites seeking a similar transfer prior to 1970. While the new requirement may indeed be different, there is nothing in the record to compel the conclusion that by allowing the union to participate in the formulation of job qualification requirements it is in any way more onerous than the prior practice of leaving questions solely to the employer.

But we think that in the modified decree specific provision should be made to assure continuing power in the District Court to monitor performance of employment practices by the Joint Committee. The burden is on the Teamsters and T.I.M.E.–D.C. to demonstrate that the process is fairly administered without minority discrimination.

### Memphis Transfer Policy

 As mentioned previously, the T.I.M.E. Memphis terminal discontinued its policy of allowing White city drivers to make extra line runs and transfer to the line in 1958 in order to avoid having to grant similar privileges to Black city drivers. The Government requested that all Whites hired into the city driver department prior to August 8, 1958 (apparently the date when the practice was discontinued) be allowed to bid on and if qualified transfer to future vacancies in the LD position with carry-over seniority as of August 8, 1958.

The District Court implicitly accepted the contention that these Whites were the victims of a racial practice directed against Blacks. But consistent with its approach generally about the need for individualized testimony, the District Court put them in App. C with its very junior priority and seniority. Of course this treatment falls with our rejection of the App. A, B, C structure.

### Layoff For Vacancy

 In connection with provisions in the Union contract for priority bidding rights after a layoff, the Court prescribed that a vacancy would not be deemed to exist unless it continued for three years.[44]

We recognize that the Union contract provision granting laid-off LDs a three-year period in which they may move into vacancies at their home terminal without competition was not adopted for discriminatory purposes. Nevertheless, we believe that to allow LDs a three-year priority right on future openings would unduly impede the eradication of past discrimination. See Hayes (II), supra at 118; Rowe v. General Motors Corp., 5 Cir., 1972, 457 F.2d 348, 358; Jacksonville Terminal, supra, at 450–51. Therefore we modify the decree to provide that when a vacancy which is not a purely temporary one arises in the LD position at a T.I.M.E.–D.C. terminal, any LD on layoff at that terminal may compete against members of the affected

---

**44.** Par. 9(a) of the District Court's final order defined a vacancy as

> any opening which is caused by the transfer or promotion to a position outside the bargaining unit, death, resignation or final discharge of an incumbent, or by an increase in operations or business where, ordinarily, additional employees would be put to work. A vacancy shall not exist where there are laid off employees on the seniority roster where the opening occurs. Such laid off employees shall have a preference to fill such laid off positions when these again become open without competition from the individuals granted relief in this case. However, if such layoff continues for three consecutive years the position will be deemed as "vacant" with the right of all concerned to compete for the position, using their respective seniority dates, including those provided for in this Order.

class on the basis of full employment seniority.

The individual with the greatest employment seniority will be given the first opportunity to qualify. We think that such modification will accommodate the discriminatees' right to advancement with the laid-off LDs "security interest" in his former position.

### Southern Area Conference Modified Seniority

As detailed earlier, the Teamsters at terminals in the Southern Area Conference (see note 5, *supra*) have adopted a Modified Seniority system under which laid-off LDs may compete for vacancies or bump junior LDs at other terminals within the Southern Conference. The District Court, while recognizing that the Southern Conference Modified Seniority provisions are neutral on their face, determined that unaltered, they would tend to impede the advancement of Blacks and SSAs into LD positions within the Southern Conference since laid-off LDs could well fill all the vacancies as they occur or even keep vacancies from occurring by bumping junior LDs at particular terminals.

██ Therefore the District Court provided the following modifications. Laid-off LDs in the Southern Conference may continue to bump junior LDs at other terminals. But where a vacancy occurs, a laid-off LD from another terminal cannot transfer in and take priority over any affected class members on App. A or App. B. In view of our disapproval of the District Court's tri-part division of the affected class, we will adapt the decree to provide that a laid-off LD may not move to another terminal where a vacancy exists and thereby automatically take precedence over *any* member of the affected class at that terminal. Of course, the laid-off LD may still move into the vacancy whenever there are no members of the affected class remaining who have not been offered the opportunity to qualify for the LD position.

The District Court further provided that the laid-off LD who bumps a junior driver at another terminal may exercise his right of recall when an opening occurs at his own terminal without competition from members of the affected class. However, when an opening occurs at the terminal where the bump took place, members of the affected class may compete on the basis of seniority with the LD on layoff who was bumped (or with any other LD on layoff at that terminal).

Finally, in an effort to modify the Modified Seniority provisions in a manner that would speed up the advancement of discriminatees into the LD position, the District Court provided that members of the affected class in the Southern Conference may bid on LD openings at other terminals within the Conference in competition with employees at that terminal on the basis of employment seniority after all members of the affected class at that terminal have been given the opportunity to bid on the position. This does not have the effect contended since this provision applies only after the priorities prescribed have been exhausted at the terminal where the vacancy occurs.

Aside from our slight modification, the District Court did not abuse its discretion in adjusting the Southern Conference Modified Seniority bidding procedure so as to accommodate the effectuation of its remedy.

### Victims and White Incumbents

██ In its original opinion the District Court provided that those in App. C were entitled to vacancies "before the general public". This, of course, subordinated them to White incumbents (not members of the class) who had no seniority for the position. By supplemental opinion and order the Court recognized that the removal of discriminatory practices would be delayed and the possibility would exist that inequities would result. Consequently it ordered that those in

App. C "shall also be given preference over other . . . TIME employees who have no seniority in the category where the vacancy occurs".

The District Court's action in the supplemental opinion was undoubtedly precipitated by the fact that the victims were divided into App. A, B and C. Since App. A and B were given preference over C and those in App. C were given relatively small relief in comparison, the Court thought it only fair to give those in App. C a priority over everyone else in relation to the relief awarded them.

In light of our abolishment of the App. A, B and C classification, however, the District Judge should have the opportunity to re-examine the preference given to those in App. C over everyone. With all the victims now in one class, the record should be developed when necessary to examine the impact of such a preference on current non-victim, incumbent employees who have been employed by the company longer than a particular victim. Consequently this portion of the remedy will be vacated for further consideration.

### Remand

The case is remanded for further evidentiary and judgmental proceedings[45] consistent with this opinion.[46]

Remanded.

---

45. With respect to the problems of the positions or rights of particular individuals, the District Court should feel free to fully use special masters, since with the large numbers of people involved, this presents "a showing that some exceptional condition requires it." F.R. Civ.P. 53(b).

46. Except for those portions of the District Court's order which we have disapproved or modified, the balance of the decree remains intact, subject to such modifications as the District Court deems appropriate as a part of the final order entered by the District Court on remand.