UNITED STATES of America, Appellant,

v.

**HAZELWOOD SCHOOL DISTRICT et al., Appellees.**

No. 75–1422.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 12, 1976.

Decided April 20, 1976.

Rehearing and Rehearing En Banc Denied May 25, 1976.

---

Cynthia L. Attwood, Atty., Dept. of Justice, Washington, D. C., for appellant; Donald J. Stohr, U. S. Atty., J. Stanley Pottinger, Asst. Atty. Gen., and Walter W. Barnett and Cynthia L. Attwood, Attys., Dept. of Justice, Washington, D. C., on the briefs.

William A. Ens, St. Louis, Mo., for appellee; William A. Ens and Don O. Russell, St. Louis, Mo., filed brief.

Before GIBSON, Chief Judge, CLARK, Associate Justice, Retired,* and BRIGHT, Circuit Judge.

Mr. Justice CLARK.

The Attorney General brought this suit on August 9, 1973, in the name of the United States, under Title VII of the Civil Rights Act of 1964[1] and the Fourteenth Amendment to the Constitution, alleging racial discrimination in the employment practices of the Hazelwood School District (Hazelwood) in St. Louis County, Missouri. The Superintendent and Board of Education of Hazelwood were also parties defendant. Jurisdiction was invoked under Section 707 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6, which authorizes the Attorney General to bring suit whenever he has reasonable cause to believe that any person has engaged in a pattern or practice of resistance to the full enjoyment of the rights secured by Title VII of the Act.

In its complaint, the United States alleged that prior to 1955, Hazelwood em-

---

* The Honorable Tom C. Clark, Associate Justice, Retired, Supreme Court of the United States, sitting by designation.

1. 42 U.S.C. § 2000e *et seq.* (1970), *as amended,* 42 U.S.C. § 2000e *et seq.* (Supp. II, 1972).

ployed no black faculty or staff in accordance with existing Missouri law which mandated racially segregated schools, and that since that time Hazelwood has continued to pursue such a pattern or practice of racial discrimination in employment by failing to employ black applicants who were as well or better qualified to teach than the white applicants who were actually employed. Injunctive relief was sought to require Hazelwood (1) to cease using discriminatory practices; (2) to take affirmative action to recruit black faculty and staff; and (3) to provide for back pay to those black applicants who were rejected because of such discriminatory patterns or practices. The district court held that the United States failed to prove that Hazelwood had engaged in discriminatory practices in violation of Title VII and the Fourteenth Amendment and denied any relief. *United States v. Hazelwood School District*, 392 F.Supp. 1276 (E.D.Mo.1975).

The United States claims that the court erred: (1) in failing to give any weight to Hazelwood's admitted pre-Title VII discrimination, (2) in applying an erroneous legal standard in determining that the United States had not demonstrated a statistical disparity between the racial composition of Hazelwood's work force and the relevant labor market; (3) in failing to recognize the relationship between the statistical evidence of discrimination and Hazelwood's standardless hiring practices; and (4) in holding that the United States had failed to prove that individual black applicants were rejected on account of race. The United States argues that it established, both by affirmative evidence and statistical summaries, a *prima facie* case of racial discrimination which shifted to Hazelwood the burden of proving that it had not engaged in any unlawful discrimination.

We have concluded that, from its establishment in 1949–1951 until at least March 1974, Hazelwood has engaged in a pattern or practice of discriminatorily failing and refusing to hire blacks in violation of the Act, and that the United States and certain black teaching applicants are entitled to relief.

## I. HAZELWOOD'S RECORD ON MINORITY HIRING

The Hazelwood School District occupies 78 square miles of territory and serves some 25,000 students, predominantly white, in some five communities in northern St. Louis County. The district borders for a short distance the St. Louis City School District. Prior to the United States Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Constitution of the State of Missouri mandated racially segregated schools. Mo.Const. Art. IX, § 1(a) (1945).

Before *Brown*, the school districts in St. Louis County assigned black faculty to black schools exclusively and white faculty only to white schools. Because no blacks lived in the Hazelwood District prior to 1954, the District did not operate a black school. Accordingly, Hazelwood employed no black faculty in its schools. Hazelwood's teacher application forms prior to 1954 contained a space for identification of race, as well as one for a photograph; indeed, as late as the 1962–63 school year, some of the forms continued to have a space for designation of race. As late as 1962 an advertisement appearing in the Clarion-Ledger Jackson Daily News of Jackson, Mississippi, solicited applications for "Kindergarten and Elementary teachers (white only)". Sometime prior to 1964, Hazelwood adopted a policy "to hire all teachers on the basis of training, preparation and recommendations, regardless of race, color or creed." However, no black teacher was hired by Hazelwood until 1969.

In the past, Hazelwood has recruited teachers from predominantly white colleges and universities throughout Missouri, Illinois, Arkansas, Kansas and Oklahoma. No recruitment was done from either of the two predominantly black colleges in Missouri, Harris Teachers College and Lincoln University; nor did Hazelwood recruit from predominantly black colleges in any other

state. There was also evidence presented at the trial concerning 55 black teachers who had applied at Hazelwood for positions but had been rejected. Twenty-five of these applicants testified in the case. The appellant sought to prove that in each instance, vacancies in the applicant's special field were filled by whites with less or no better qualifications.

Statistical information introduced by the United States demonstrated that Hazelwood employed only one black in 1969, and six blacks (0.6 percent of the total teachers in the district) in 1970–71. Thirteen blacks were employed out of a total of 1,197 teachers (1.1 percent) in 1972–73. During the 1973–74 school year, Hazelwood employed 22 black teachers out of a total of 1,231 (1.8 percent). In St. Louis City and County, however, over 15 percent of the teachers were black in 1970.

Hazelwood's hiring procedures may well be the crux of the problem. It uses virtually no standards in making its selections.

Applicants complete an application form which is filed in the central personnel office. Each year all applicants are requested to update their forms, and those not updated are destroyed. An applicant must be interviewed to be hired. When a vacancy is anticipated or occurs, the principal of the school involved notifies the personnel office, and the director of the latter office then selects applicants in the relevant field from the application cards. Those selected are notified to arrange for interviews with the employing principal. When an application is filed, it is the practice of the personnel officer merely to check the eligibility of the applicant under Missouri certification requirements.[2]

Upon receipt of a request from a principal to employ a new teacher, the director of the personnel office usually notifies those applicants who have recently come to the attention of the office or have kept the office advised of their continuing availability.[3] Groups of applicants generally meet

---

**2.** Although Hazelwood requires that a teacher hold a valid certificate before he or she enters the classroom, frequently the District makes offers of employment to persons before they have obtained certificates. At the deposition taken on February 14, 1974, the United States questioned Clifford Kirby, Superintendent of Hazelwood's Schools from 1953 until the middle of 1967, about this practice:

Q. For someone who is a new graduate and perhaps has not yet been certified by the school or by the School Board, would you hire them prior to their actually receiving the actual certificate?

\*　　\*　　\*　　\*　　\*　　\*

A. If you will look on the contract which is prescribed by the State of Missouri, it has all the various sections relative to the employment of teachers. One of the sections there is that before they can enter into a classroom they must have a valid certificate. When they sign that contract, that contract becomes invalid if they can't produce to the school a valid certificate on the opening day of school.

Q. But they would be hired?

A. Certainly we hired graduates before they would graduate, with the understanding that they would be graduating and would have a certificate to teach.

Evidence was admitted at trial which listed 101 Hazelwood teachers who were not certified at the time they applied but were subsequently hired. Fifty-three of these teachers had not

received their certification at the time they were offered employment.

**3.** Forty-five of the 55 black applicants for whom the Government is seeking relief were eliminated at this stage of the application process by never being interviewed. Mr. J. W. Hord, Director of Personnel for Hazelwood, was asked about the process of selecting applicants for interviewing:

Q. You said twelve years ago you used to try to interview everyone that applied?

A. No I didn't say that. I said we used to contact everyone to tell them there was a vacancy.

Q. And now you attempt to contact who for a vacancy?

A. The people that have notified us that they were available for a position and the ones that we are sure are available, these are the first ones we contact.

Q. ˙Okay. How do you mean persons have notified you to say they are available?

A. Because we have people who are constantly calling the office advising us of their availability.

Q. So you would select for or arrange interviews with the persons that have called the office and asked, been continually asking for interviews? They would be first?

A. This is part of it.

Q. Alright, who else would be included among those contacts?

with Hazelwood's secondary or elementary coordinator, who describes the District to them, and the respective school principal then interviews individually the applicants referred from the personnel office. The principal thereafter suggests a choice to the coordinator, who, in turn, makes a recommendation to the Superintendent. As a general rule, the choice of the principal is determinative. The principals are given no guidance as to how to select teachers beyond the general instruction to hire the "most competent" person available. Since there are 23 principals in Hazelwood, there are 23 different hiring standards within the general instruction of the Board to hire the "most competent" applicant. The Superintendent of Hazelwood testified that no standards had been developed; that the philosophy is that "the principal should have the leeway to employ the most competent people that he knows of or that he can find for the position"; that with regard to the efficacy of such a selection method "we have not conducted any studies along this line." The former Superintendent testified that Hazelwood "had no objective measurements other than your subjective opinions of the person hooked onto the recommendations and their file from the placement office." The Coordinator of Secondary Education for Hazelwood testified that he had been given no standards other than to hire "the best candidate for the position." The only minimum uniform standard applied in Hazelwood's hiring process is that a candidate must possess a health certificate and a Missouri Teachers Certificate prior to the first day of classes.

To rebut the Government's case, Hazelwood relied almost entirely upon its cross-examination of the Government's witnesses. Hazelwood introduced only one witness and several exhibits of its own. The witness testified to the total number of teachers who applied and were hired during the 1971–72 and 1973–74 school years—3,127 of which 234 were hired in 1971–72 and 2,373 of which 282 were hired in 1972–73. The exhibits consisted of the policy manual, policy book, staff handbook, and historical summary of the formation of the Hazelwood School District. Hazelwood argued that no discrimination could be proved because equal employment opportunity was the official policy of the District and because the small number of its black teachers was comparable to the small number of black students enrolled in Hazelwood's schools.

## II. PRIMA FACIE SHOWING OF DISCRIMINATION

■ The district court held that the United States failed to prove that the defendants had engaged in discriminatory hiring practices in violation of Title VII and the Fourteenth Amendment. We disagree. Evidence was adduced at trial demonstrating (1) a history of discriminatory practices in the hiring of teachers by Hazelwood prior to the effective date of Title VII,[4] (2) a statistical disparity between the proportion of blacks in Hazelwood's workforce and the proportion of blacks in the labor market,[5]

A. Those people who were rather recent applicants.
Q. Anyone else?
A. And if we have enough openings, we would attempt to contact a greater number of the people depending on the teaching area.
Q. Okay. How many people do you like on interview for each particular vacancy?
A. It depends on the coordinator and the principal. Both may decide we only want six or seven, or three or four; or ten.
Q. So, if I understand you correctly, to select or interview you would check to see if the person was certified or appeared that he would be certified and then you select from those persons the persons who have notified the Hazelwood district that they are available for employment and by notification I mean other than submitting the application?
A. Right.

4. Title VII of the Civil Rights Act of 1964 took effect on July 2, 1965. It was amended to apply to public employers such as the Hazelwood School District effective March 24, 1972. Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 2, 86 Stat. 103, amending 42 U.S.C. § 2000e(f) (1970).

5. Some caution is necessary when using statistical evidence to analyze such disparities in employment figures for professional and academic positions. The raw data often will obscure the actual number of persons in the gen-

(3) an unstructured decentralized hiring process in which subjective criteria predominate in evaluating candidates, and (4) specific discrimination against 16 black applicants for teaching positions at Hazelwood. After considering this evidence, we conclude that a *prima facie* case of discrimination was made out by the Government.

■ Proof of racial discrimination in the hiring of teachers prior to the effective date of Title VII included evidence that prior to 1954, Hazelwood employed no black teachers in its all-white schools in accordance with the custom in the county; that from the time that Hazelwood's schools were integrated until 1969, it employed no black teachers; that Hazelwood placed newspaper advertisements for "white only" teachers in 1962; and that Hazelwood officials have never recruited from any predominantly black college,[6] although they did recruit from predominantly white universities in Missouri and elsewhere. The district court gave little, if any, weight to this evidence, even though it is highly relevant to show that present policies or practices, which appear neutral on their face, perpetuate past discriminatory practices. *United States v. T. I. M. E.—D. C., Inc.*, 517 F.2d 299 (5th Cir. 1975); *United States v. Jacksonville Terminal Co.*, 451 F.2d 418 (5th Cir. 1971); *United States v. Sheet Metal Workers, Local 36*, 416 F.2d 123 (8th Cir. 1969).

■ "In the problem of racial discrimination, statistics often tell much, and Courts listen." *Alabama v. United States*, 304 F.2d 583, 586 (5th Cir.), *aff'd per curiam*, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). Courts frequently have inferred from statistical evidence the existence of a pattern or practice of discrimination. There is virtual unanimity on the proposition that the showing of a statistical disparity between the proportion of blacks in the employer's workforce and the proportion of blacks in the relevant labor market makes out a *prima facie* case of discrimination in violation of Title VII. *Rodriguez v. East Texas Motor Freight*, 505 F.2d 40, 53 (5th Cir. 1974); *United States v. Wood Lathers, Local 46*, 471 F.2d 408, 414 n. 11 (2d Cir.), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); *United States v. Chesapeake and Ohio Ry. Co.*, 471 F.2d 582, 586 (4th Cir. 1972), *cert. denied*, 411 U.S. 939, 93 S.Ct. 893, 36 L.Ed.2d 401 (1973); *Rowe v. General Motors Corp.*, 457 F.2d 348, 357 (5th Cir. 1972); *United States v. St. Louis-San Francisco Ry. Co.*, 464 F.2d 301, 307 (8th Cir. 1972); *Carter v. Gallagher*, 452 F.2d 315 (8th Cir. 1971), *modified on rehearing, en banc*, 452 F.2d 327, *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).

■ In the present case, the district court found that the United States had failed to establish a *prima facie* case of discrimination on the basis of statistical evidence. However, the record shows that it offered evidence showing that no black teachers were on the Hazelwood faculty until 1969, and that during the 1970–71 school year, it employed only six black teachers out of a staff of 957 (0.6 percent); and by the end of the 1972–73 school year, although Hazelwood's teaching staff numbered 1,107, only 16 (1.1 percent) were black. During the 1973–74 school year, 22 (1.8 percent) of Hazelwood's teaching staff of 1,231 were black. In contrast, over 15 percent of the teachers in the relevant geographical area —St. Louis City and County [7]—were black

eral workforce, white and black, who possess the special qualifications needed for particular openings. Here the problem has been minimized by the use of data from surrounding school districts (where the average number of black teachers is as high as 15%), the size of the disparity (2% as compared to 15%), and the presence of other indicia of discrimination.

6. In 1963 or 1964, J. W. Hord, personnel director for the Hazelwood schools, made one visit to Lincoln University, a predominantly black university in Missouri. He spoke with the placement director there but did not interview any teaching candidates.

7. We accept the Government's contention that St. Louis City and County is the relevant labor market area for our consideration. The relevant labor market area is that area from which the employer draws its employees. *United States v. Ironworkers Local 86*, 443 F.2d 544, 551 n. 19 (9th Cir. 1971). Of the 176 teachers hired by Hazelwood between October, 1972, and September, 1973, approximately 80 percent resided in St. Louis City and County at the

in 1970. The district court concluded that this evidence did not constitute a *prima facie* showing of employment discrimination since less than two percent of the students in the Hazelwood schools are black.

It stated:

The number of black teachers employed by the Hazelwood district is undeniably meager. Nonetheless, it has kept pace with the small but steadily increasing black enrollment in the district. For the 1970–71 school year the six black teachers hired by the Hazelwood district comprised less than one percent of its total faculty. However, the number of black students enrolled during that period was likewise only one percent of the total district attendance. In 1973 the ratio of black teachers increased to 2%, consistent with a black enrollment in that year of 576 out of 25,166 total students. These figures do not establish the existence of statistical discrimination within the Hazelwood district.

392 F.Supp. at 1287–1288.

The district court erred in comparing the percentage of black teachers in Hazelwood with the percentage of black students in its schools rather than with the percentage of black teachers in the relevant labor market area. The law is well-settled that the relevant consideration in an employment discrimination case is the statistical disparity between the proportion of blacks in the employer's workforce and the proportion of blacks in the labor market. *See, e. g., United States v. Hayes International Corp.*, 456 F.2d 112 (5th Cir. 1972); *Carter, supra*, 452 F.2d 315; *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970). The level of black student enrollment in Hazelwood school sheds no light whatsoever upon the dispute before us, and the district court clearly erred in absolving Hazelwood of unlawful employment practices on the basis of the paucity of black students in the Hazelwood schools.

The demonstrated statistical disparity between the racial composition of Hazelwood's workforce and the relevant labor market is particularly revealing when considered in light of Hazelwood's subjectively-based selection procedures. In Hazelwood, the district court found, each principal is vested with almost total discretion in hiring teachers for his school. All of the elementary and secondary school principals in Hazelwood are white. The only guidance that these principals receive from their superiors is the instruction to select the "most competent" person available. Principals are free to give whatever weight they desire to subjective factors in making their hiring decisions. Indeed, one principal testified that interviewing an applicant was "like dating a girl, some of them impress you, some of them don't." As noted by the district court, the principals all use identical interview forms which contain spaces for evaluation of an applicant's personal attributes, including personal appearance, knowledge of subject area, confidence, personality, and the like. Yet we find no evidence to support the court's finding that through use of these forms "substantial uniformity" in hiring decisions "is achieved throughout the district." 392 F.Supp. at 1289. In fact, no evidence was presented which would indicate that any two principals apply the same criteria—objective or subjective—to evaluate applicants. In our view, it is more than mere coincidence that the use of such procedures produced only a few black teachers.

These hiring procedures are similar in many respects to the promotion procedures considered in *Rowe v. General Motors, supra*, 457 F.2d 348. In *Rowe*, a unanimous court of appeals condemned a promotional system in which:

(i) The foreman's recommendation is the indispensable single most important factor in the promotion process.

(ii) Foremen are given no written instructions pertaining to the qualifi-

time of their initial employment. Approximately one-third of the teachers hired during this period resided in the City of St. Louis and

40 percent resided in areas of St. Louis County other than the Hazelwood District.

cations necessary for promotion. * * *

(iii) Those standards which were determined to be controlling are vague and subjective. * * *

457 F.2d at 358–359.

This promotional system, the court of appeals noted, was highly susceptible to the abuses of racial discrimination:

* * * [P]romotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. We and others have expressed a skepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action.

*Rowe v. General Motors Corp., supra,* 457 F.2d at 359 (citations omitted). The hiring procedures used by Hazelwood are similarly susceptible to discrimination. Vague and subjective criteria may disguise discriminatory practices, whether or not that was the original intent. If hiring criteria "operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability," then the absence of discriminatory intent will not serve to redeem them. *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 165 (1972). Because Hazelwood's hiring procedures have spawned a disproportionately white faculty, we view them with skepticism.

■ The law does not preclude Hazelwood from considering previously announced, non-discriminatory, subjective criteria in deciding whom it will hire, *Moore v. Bd. of Educ. of Chidester,* 448 F.2d 709, 713 (8th Cir. 1971), as long as such factors are shown to be related to job performance. *Griggs, supra,* 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164. However the law in this Circuit is clear that employment decisions based on subjective standards carry little weight in rebutting charges of discrimination. *Green v. McDonnell Douglas*

*Corp.,* 463 F.2d 337, 352 (8th Cir. 1972), *modified,* 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 678 (1973); *Moore, supra,* 448 F.2d at 713. The Fourth Circuit is in agreement:

Elusive, purely subjective standards must give way to objectivity if statistical indicia of discrimination are to be refuted. * * *

[I]n the absence of objective criteria applied to all workers alike, the statistics indicate that race is the only identifiable factor explaining the disparity between the jobs held by white employees and those held by black employees. The proof discloses no objective standards based on education, experience, ability, length of service, reliability, or aptitude to account for the preferential employment of white workers. * * *

[I]n sum, the lack of objective guidelines for hiring and promotion and the failure to post notices of job vacancies are badges of discrimination that serve to corroborate, not to rebut, the racial bias pictured by the statistical pattern of the company's work force.

*Brown v. Gaston County Dyeing Machine Co.,* 457 F.2d 1377, 1382–1383 (4th Cir.), *cert. denied,* 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972) (citations omitted).

We hold that statistical evidence demonstrating a disparity between the proportion of blacks in Hazelwood's workforce and the proportion of blacks in the relevant labor market, when considered in light of Hazelwood's hiring procedures involving the use of vague and subjective criteria, indicate a *prima facie* case of a pattern or practice of employment discrimination in violation of Title VII. Buttressing this aspect of the Government's proof is evidence of actual discriminatory practices in the hiring of teachers during the period prior to the effective date of Title VII and in the rejection of some 16 black applicants discussed below. The Government's proof thus established a *prima facie* case. Hazelwood offered no evidence adequate to rebut the inference of discrimination created by the

aforementioned evidence. We therefore reverse the judgment of the district court.

## III. DISCRIMINATION AGAINST SPECIFIC INDIVIDUALS

The United States argues that 55 qualified black applicants for teaching positions in the Hazelwood schools were refused employment on the basis of race. Twenty-five of these applicants testified at trial. The Government offered documentary evidence from Hazelwood's personnel files to show that subsequent to the application of each of the 55 blacks, vacancies in the applicant's field were filled by whites with less or no better objective qualifications than those of the black applicants. The district court ruled, however, that there was no basis in the record for concluding that Hazelwood acted in a discriminatory fashion in failing to hire the 55 applicants.

The United States contends that the district court erred in so holding and requests back pay and other appropriate injunctive relief for those applicants who were refused employment on the basis of race. We believe that for an applicant to be entitled to specific relief, the United States had the burden at trial of establishing a *prima facie* case of racial discrimination against him or her. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court held that a private, non-class-action

> * * * complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.

This four-pronged test, we think should be applied to the 55 applicants before us even though this is not a private action, but rather one brought by the Attorney General. *See, E. E. O. C. v. Detroit Edison Co.*, 515 F.2d 301, 316 (6th Cir. 1975). Subsection (iv) is satisfied here by a showing that within a reasonable time after application, vacancies in the applicant's field were filled by whites with less or no better qualifications than those of the black applicant. The only applicants entitled to specific relief are those for whom the Government has established a *prima facie* case by satisfying the test, and whose *prima facie* case was not rebutted by defendants.

The district court made specific findings regarding 41 of the 55 rejected black applicants. We shall examine these findings with regard to each applicant, applying the standard articulated in *Green, supra*, 416 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677. Of course, the findings of fact made by the district court are entitled to full credit before this court, except for those that the record reveals to be clearly erroneous. Fed.R.Civ.P. 52; *Barryhill v. United States*, 300 F.2d 690, 693–694 (8th Cir. 1962). Ordinarily, where we reverse a district court's interpretation of the law applicable to a set of facts, it is appropriate simply to remand the injured parties to the district court for further relief. In this instance, however, we believe that a review of the specific findings on 41 of the applicants serves both the interests of justice and judicial economy by hastening relief for those discriminated against, and by preventing further litigation of the claims for which no *prima facie* case has been made.

We hold that the following applicants established a *prima facie* case of discrimination which was not rebutted by Hazelwood and that they are entitled to specific relief:

1. Derek Novel applied for a position as a junior or senior high social studies teacher on January 31, 1973. Novel had an outstanding academic record, had experience as a student teacher, and had travelled

widely. Hazelwood informed Novel on several occasions that there were no vacancies in his field and never interviewed him. Evidence produced by the Government, however, showed that 10 persons applying after Novel for the same position were subsequently hired. At least five of these persons had teaching experience comparable to, or lesser than that of Novel. All five had weaker academic records. One had even been dismissed from his university on the basis of his grades. Hazelwood offered no evidence to explain why Novel was never considered for any of the positions filled after his application, or why Novel was told that there were no vacancies, when, in fact, there were. The district court's finding that Hazelwood did not act in a discriminatory manner in failing to hire Novel is clearly erroneous.

2. Robert Howell applied in March of 1973 for a position teaching in the same area as had Novel, secondary social studies. Howell graduated from the University of Missouri and was awarded a scholarship on the basis of his grades. At the time of his application, he had a life certificate in Missouri with two years of experience teaching in his field. Moreover, Howell had served as a student teacher at Hazelwood Senior High, and his cooperating teacher had been impressed with his abilities. Hazelwood offered no evidence to explain why Howell was never interviewed for any of the 10 vacancies in social studies filled by whites subsequent to his application. Only one of these whites had more experience than Howell. Neither did Hazelwood attempt to explain why, as a former student teacher at Hazelwood, Howell was not given preference over other applicants, in light of their practice of doing so. We hold the district court's finding that the failure to hire Howell was non-discriminatory to be clearly erroneous.

3. James Washington also applied for a position as a social studies teacher at the beginning of 1973. Washington graduated from college in 1972 and held a life certificate in Missouri at the time of his application. He had experience as both a student and a substitute teacher. Sometime after he applied, Washington was told by Hazelwood that there were no vacancies in his field, although ten vacancies in this area were filled by whites subsequent to his application. Five of these whites had experience comparable to, or less than, that of Washington. Hazelwood offered no evidence to rebut the inference of discrimination resulting from the Government's evidence. The district court's finding that Washington had suffered no discrimination at the hands of Hazelwood is clearly erroneous.

4. Samuel Downs applied for a position as an industrial arts teacher on May 24, 1972. At that time Downs held a life certificate in Missouri and a bachelor of sciences degree in industrial arts. He had one year of experience teaching industrial art in St. Louis. Downs never had a formal interview but was told by Hazelwood's personnel director that there would probably be no vacancies in his field. Two such vacancies were filled after his application for the 1972–73 school year. One of the teachers hired had the same amount of experience as Downs, and the other had less. The latter, unlike Downs, did not even possess a state life certificate at the time of his application. Hazelwood submitted no evidence to explain why Downs was not considered for either of these positions. We hold the district court's finding that the failure to hire Downs was non-discriminatory to be clearly erroneous.

5. Alice Moore Roach applied for a position as an elementary teacher April 30, 1972. Roach had an excellent academic record with experience as a student teacher. However, she was never interviewed. The district court erred in finding that Roach was not hired because she lacked teaching certification at the time she applied. Forty-six elementary school teachers with similar experience were hired subsequent to Roach's application. Eight of these 46 teachers also had not applied for certification at the time they applied for teaching positions. Hazelwood offered no evidence to explain why a different standard was

applied to these eight white applicants than was applied to Roach. The district court's finding that Hazelwood did not discriminate against Roach on the basis of race is held to be clearly erroneous.

6. Cynthia Edmond applied for a position as a teacher of social studies on July 11, 1972. Subsequently she was told there were no vacancies in her field. The following year she renewed her application. Edmond testified that in college she had a 3.9 grade point average on a 4.0 scale in her major. She possessed a life certificate at the time of her application and had experience student teaching a twelfth grade government class. Edmond was never interviewed by Hazelwood. The district court apparently overlooked evidence that, after Edmond was told no vacancies existed, five whites were hired as social studies teachers for the 1972–73 school year. Three of the five whites had teaching experience no greater than that of Edmond. Nine vacancies in the field of social studies were filled for the 1973–74 year after Edmond had renewed her application. Four of the teachers hired to fill these vacancies had no more teaching experience than Edmond. Hazelwood offered no evidence to explain why in 1972 Edmond was told there were no vacancies when, in fact, there were, or why she was not hired for any of the openings for the 1972–73 or 1973–74 terms. The finding of the district court that Edmond was rejected for non-discriminatory reasons is clearly erroneous.

7. Beverly Ellis applied for an elementary teaching position on August 4, 1972. Ellis had a life certificate and seven years of teaching experience at several different schools. She was interviewed at Brown and Charbonier elementary schools, but was not offered a position at either. Hazelwood offered no evidence to rebut her testimony in support of the Government's view that these interviews were insufficient reason for refusing employment. Moreover, the district court failed to discuss evidence showing that 51 other elementary teaching positions were filled subsequent to her application by persons of lesser experience, 33 of whom had only student teaching experience. Hazelwood offered no evidence to show why she was not hired for any of these 51 positions. We hold that Ellis established a *prima facie* case of discrimination which was not rebutted by Hazelwood.

8. Delores Penton applied for a kindergarten or elementary level position on June 21, 1973. Penton testified that she had a 3.29 grade point average on a 4.0 scale in college and had three years of experience teaching elementary school. Penton was never interviewed. The finding of the district court that she was not hired because she lacked certification was clearly erroneous. The United States offered evidence showing that five persons were hired by Hazelwood as elementary level teachers after Penton's application, all of whom lacked certification at the time of their applications. None of them had as much teaching experience as Penton. Hazelwood offered no evidence to rebut the inference of discrimination created by this evidence. We hold that Penton was denied employment on the basis of race.

9. Timotheus Carson applied for a position teaching secondary English, French, or German on April 6, 1972. Carson possessed a Master of Arts degree in English, French, and German and a life certificate. Moreover, he had 10 years of experience teaching languages. The day after he applied, Carson was interviewed by the department chairman, who rated him very highly. However, Hazelwood never offered him a position. The district court failed to note that subsequent to his application, 23 teachers in Carson's field were hired for the 1972–73 school year, all having less teaching experience than he. The great majority of these teachers had significantly less experience than Carson and only one had a master's degree. The finding of the district court that Carson was not rejected on racial grounds is clearly erroneous in light of the Government's evidence.

10. Georgia Shaw applied for a position as an elementary level teacher on April 27, 1973. Shaw had a degree in elementary education and had applied for her Missouri

certification at the time of her application with Hazelwood. Moreover, Shaw was a student teacher at Black Jack Elementary School in the Hazelwood District. Her co-operating teacher stated on Shaw's evaluation form dated March 1, 1973:

> She [Shaw] has a good rapport with the children, but she is also able to use effective methods of discipline. She is a willing worker and will do anything that is suggested. She has also shown initiative in making individual projects, games, learning packets, and other aids, to help the individual child. I feel Georgia has the qualities and capabilities which when fully developed will make her a very effective teacher.

Hazelwood never interviewed Shaw. The district court clearly erred in finding that she was not hired because she lacked proper certification at the time of her application. Thirteen whites with no more than student teaching experience were hired by Hazelwood to teach elementary school during the 1973–74 school year. All 13 teachers were interviewed after Shaw's application. Seven of these teachers also lacked certification at the time of their applications. Hazelwood offered no evidence to explain why Shaw was not hired for one of these positions, in light of her comparable qualifications and the laudatory recommendation of her cooperating teacher. We hold that the Government established a *prima facie* case of discrimination against Shaw, which was not rebutted by Hazelwood.

11. Alexis Smith applied for a position as an elementary school teacher on April 21, 1972. Smith had an undergraduate degree in elementary education and had experience as a student teacher. At the time of her application, Smith had applied for certification in Missouri. Hazelwood never interviewed her. The district court's finding that she was not hired because, at the time of her application, she lacked proper certification was clearly erroneous. Twenty-five white teachers with experience no greater than Smith's were hired as elementary teachers for the 1972–73 school year. Twelve of these teachers also lacked certification at the time of their applications. Hazelwood produced no evidence to explain why Smith was not hired for one of these positions. We hold that the Government established a *prima facie* case of discrimination against Smith which was not rebutted by Hazelwood.

12. Geraldine Thomas applied for a position as fourth, fifth, or sixth grade teacher in April of 1972. Thomas had an undergraduate degree in elementary education and had more than five years of experience teaching fifth grade. Hazelwood never interviewed her. The finding of the district court that Thomas was not hired because she lacked proper certification is clearly erroneous. Evidence adduced by the Government showed that at least six positions for the 1972–73 school year were filled by white teachers, who also lacked certification at the time of their applications. None of these teachers had experience comparable to that of Thomas. Hazelwood produced no evidence to explain why she was not hired to fill one of these positions. A *prima facie* case of discrimination against Thomas was made out by the United States and was not rebutted by Hazelwood.

13. Mary Etta Wilson applied for a position teaching first, second, or third grade on April 5, 1972. In December of 1972, she wrote Hazelwood asking that her application be kept in the active file. Wilson had an undergraduate level degree in elementary education and more than five years of experience teaching grades one through three. Hazelwood never interviewed her. The district court clearly erred in finding that Hazelwood rejected her for lack of proper certification at the time of her application. The Government's evidence demonstrated that at least eight white teachers, who also lacked certification when they applied, were hired for the school years 1972–73 and 1973–74 to teach at the elementary level. All 8 teachers had less teaching experience than Thomas, and four of them had experience only as student teachers. Hazelwood offered no evidence to explain why Wilson was rejected in favor of less qualified whites. The Government, we hold, made out a *prima facie* case of dis-

crimination against Wilson which was not rebutted by Hazelwood.

14. Robert Wilson applied for a position teaching junior or senior high school science on April 5, 1972. In December of 1972, he wrote Hazelwood asking that his application be kept in the active file. Wilson had an undergraduate degree in science and seven years experience teaching science courses on the senior high level. Hazelwood never interviewed him. The finding of the district court that Wilson was rejected because he lacked certification at the time of his application is clearly erroneous. Evidence adduced by the Government showed that, after Wilson's application, at least five junior or senior high level science teachers, who also lacked certification when they applied, were hired for the 1972–73 or 1973–74 school years. None of the five had as much teaching experience as Wilson; four had experience only as student teachers. Hazelwood produced no evidence to explain why Wilson was not hired for one of these positions. We conclude that the United States established a *prima facie* case of discrimination against Wilson, and Hazelwood failed to rebut it.

15. Cozeene Triplett applied for a position as an elementary guidance counselor on August 21, 1972. Triplett had a master's degree in counselor education. His application forms indicate that he had certification in elementary administration and seven years of experience teaching fifth grade. Hazelwood never interviewed him. The finding of the district court that Triplett was rejected because he applied "after all teachers for the coming school year had been hired," 392 F.Supp. at 1286, was clearly erroneous. The defendants, the Government evidence showed, hired a white elementary counselor nine days after Triplett applied. This counselor applied after Triplett had, and was interviewed the same day she applied. She did have a master's degree in counselling, but had three fewer years of teaching experience than Triplett. No evidence was offered by Hazelwood to show why Triplett was rejected in favor of a comparably, if not less, qualified white.

We hold that the United States made out a *prima facie* case of discrimination against Triplett which was not rebutted by Hazelwood.

16. Willie Palmer applied for a position as a reading specialist, an administrator, or a science teacher on May 3, 1972. Palmer had an excellent academic record and 15 years of experience teaching reading, science, and elementary school. Palmer possessed a life certificate for elementary education. The district court found that he was not certified as a science teacher, and that he lacked a master's degree as required for an administrative position in Missouri. The district court did not discuss evidence adduced by the Government showing that, after Palmer's application, the defendants hired 57 persons to teach elementary school or reading during the 1972–73 school year. None of these persons had as much teaching experience as Palmer. The district court considered significant the fact that Palmer's salary in a non-teaching job at the time of his application was higher than the salary the Hazelwood District could offer him. In light of the fact that Palmer *applied for* the lower-salaried teaching position, evidence concerning the level of his current salary was totally inadequate to rebut the inference of discrimination created by the Government's evidence. Dedicated teachers often choose to teach or remain in teaching positions without regard for the pecuniary compensation involved. The finding of the district court that Palmer was rejected on a non-discriminatory basis is clearly erroneous.

We agree with the district court that the Government's evidence did not substantiate a finding of discrimination against the remainder of the 55 black applicants, including the following individuals, for whom specific findings were made: Judith Ealy, Lonnie Lockett, Patricia Fletcher, Nikki Lenoir, Pearlie Boyd, Atry Cotton, Melvin Lowe, Westelle Florez, Cullen Cook, Naomi Cooksey, Jerome Trotter, Gerald Trotter, Geneice Kincaid, Vina Jones, Charlene Catlin, Jerry Fitch, Harriet Mullins, Naomi Easter, Ruby Lee Carroll, Jesuita Payne, Marva

Hill, Elwood Moore, Rosa Lee Thompson, Alberta Riggs, and Sandra Reid.

## IV. REMEDY AND BACKPAY

We have held that the Government established a pattern or practice of discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq., as amended,* 42 U.S.C. § 2000e *et seq.* (Supp. II, 1972), by showing that Hazelwood's subjectively-based hiring procedures have resulted in a statistical disparity between the proportion of black teachers employed by Hazelwood, and the proportion of black teachers in the labor market. Furthermore, we have concluded that the United States proved unlawful discrimination against 16 rejected black applicants.[8] We believe that the United States and these 16 black applicants are entitled to relief.[9]

On remand the district court shall enter an order consistent with the following directions:

1) Hazelwood, its officers, agents, employees, and successors are to be enjoined permanently from engaging in any act or practice in the hiring of teachers which has the purpose or effect of discriminating against any individual because of his race or color.

2) Hazelwood shall promulgate accurate job descriptions and hiring criteria to ensure that all black and white applicants for teaching positions are evaluated on the same basis.

3) Hazelwood shall list clearly on its recruiting and application materials both the requirements for its teaching positions and the procedures by which its selections are made. The materials also shall include both *a*) an announcement that race or color operates as no bar to employment with Hazelwood, and *b*) a description of the proper subjective factors to be considered during the interview portions of the selection procedure, e. g., skill and clarity of expression, self-confidence and attitudes toward teaching.

4) Hazelwood shall ensure that equal notice concerning available openings be given to potential applicants, both black and white. In recruiting procedures, if any, Hazelwood shall include on an equal basis recruiting visits to predominantly black colleges and other institutions. Appropriate steps to ensure student teaching opportunities at Hazelwood for black college students shall also be taken.

5) The district shall make periodic reports to the Justice Department for the three school years subsequent to the entry of the district court's decree on its conduct in hiring qualified black teachers.[10] It shall maintain a record, available for Government inspection, explaining its reasons for selecting a white applicant over available black applicant(s) for each vacancy filled during the three-year period.

6) Hazelwood shall place the names of the 16 applicants discriminated against on a preferred hiring list, giving them the right to refuse first any vacancies to which their qualifications entitle them.

7) On remand, the district court shall award backpay to Timotheus Carson and Beverly Ellis, and it shall determine whether there are any reasons why backpay should not be awarded to the other 14 applicants.[11] The measure of such an award is

8. Although 14 of the 16 were never interviewed, their race was apparently known to the school district from indications on their application, e. g., Georgia Shaw included a picture with her application, Cozeene Triplett listed all-black Lincoln University as his undergraduate school, and Elwood Moore marked the top of his application with the words "I am Black."

9. Title VII empowers the court to:
enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropri-

ate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay * * *.
42 U.S.C. § 2000e–5(g).

10. In the past, we have found such reporting to be a useful remedy for eliminating discrimination. *United States v. N.L. Industries, Inc.,* 479 F.2d 354, 378, 380–82 (8th Cir. 1973).

11. The Supreme Court has recently emphasized that it was Congress's purpose in enacting Title VII "to make persons whole for injuries suffered on account of unlawful employ-

the difference between the earnings of an applicant had he been employed by Hazelwood and his actual earnings after the time his employment with Hazelwood should have begun, or amounts earnable with reasonable diligence since that time. *E.E.O.C. v. Detroit Edison Co., supra,* at 315.

It is so ordered.

Reversed and remanded.

GIBSON, Chief Judge (dissenting).

I respectfully dissent. The District Court in the instant case concluded that though "[t]he number of black teachers employed by the Hazelwood district is undeniably meager," there is no "basis in the record * * * for concluding that defendants acted in a discriminatory fashion in failing to hire these fifty-five black applicants during 1972 and 1973." 392 F.Supp. at 1287, 1289. During recent years Hazelwood has had to turn away teacher applicants at the rate of two to three thousand per year. For example, only 282 out of 2,373 applicants for the 1972–73 school year were hired. However, the majority, on a cold appellate record, reverses the District Court's finding and concludes instead that:

[S]tatistical evidence demonstrating a disparity between the proportion of blacks in Hazelwood's workforce and the proportion of blacks in the relevant labor market, when considered in light of Hazelwood's hiring procedures involving the use of vague and subjective criteria, indicate a *prima facie* case of a pattern or

practice of employment discrimination in violation of Title VII.

Majority opinion, at 813.

Though the evidence of discrimination with respect to a handful of the 55 applicants presents a close case, in my view the District Court's finding is not clearly erroneous and should not be disturbed. As to the remainder of the applicants, the Government simply did not come close to proving that the district unlawfully discriminated on account of race.

Under the majority's rationale, every qualified black applicant must be hired in favor of similarly qualified whites, regardless of the tremendous oversupply of qualified applicants seeking employment. This cannot be the law. The matter of determining which of the many teacher applicants are qualified and desirable candidates according to the needs of the district is exclusively for the "broad and sensitive expertise of the School Board and its officials." *Kemp v. Beasley,* 389 F.2d 178, 189 (8th Cir. 1968); *accord, Smith v. Board of Education,* 365 F.2d 770, 782 (8th Cir. 1966). To justify federal interference in the hiring process under Title VII, actual discrimination should be proved, not presumed.

The majority here takes an unwarranted step in directing and monitoring the operation of a local school system, in effect undertaking the administrative and operational powers of the school board and officials. This can only lead to a further deterioration in the quality of public education, with a substantial increase in costs on the already

---

ment discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280, 297 (1975). After discussing the wide discretion of the courts in Title VII cases to "fashion the most complete relief possible," the Court ruled:

It follows that, given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.

   \*    \*    \*    \*    \*    \*

It is necessary, therefore, that if a district court does decline to award backpay, it carefully articulate its reasons.

*Id.* at 421 and n. 14, 95 S.Ct. at 2373, 45 L.Ed.2d at 298.

Both Carson and Ellis had completed the entire application process by being interviewed for positions for the '72–'73 school year. The remaining fourteen were never interviewed and thus the the record is unclear as to when they would have commenced employment had they not been discriminated against. We hesitate to decide the eligibility of these fourteen for backpay without such information, and accordingly remand the question to the district court.

overburdened taxpayer. In reality, the two applicants to whom the majority grants backpay are receiving an unearned windfall from school district funds. Of the thousands of applicants rejected by the district, the great majority of whom were likely qualified, these two (and perhaps the remaining 14 to be considered on remand) were fortuitous enough to be black and to complain about not being hired in favor of whites who were similarly or perhaps somewhat less qualified.

I feel particularly uncomfortable with the majority's undue reliance upon inconclusive statistical evidence and with the court's imposition of such a broad remedy. Though, as the majority notes, courts in Title VII litigation do "listen" to statistical evidence, such listening must be done "with a critical ear," *Logan v. General Fireproofing Co.,* 521 F.2d 881, 883 (4th Cir. 1971), closely scrutinizing the many complex variables of statistical empirical proof. *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 231 n. 44 (5th Cir. 1974). I believe the majority has misinterpreted the significance of the District Court's reference to the ratio of black teachers to black students in the Hazelwood district, and has improperly adopted the St. Louis metropolitan area as the relevant labor market to inflate and distort the concentration of available black teachers for comparison.

Here, as always, determination of the relevant labor market from which the employer draws its employees was a question for the trier of fact, *see United States v. Ironworkers Local 86,* 443 F.2d 544, 550–51 (9th Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971), not for this court to make on limited appellate review. The District Court made no explicit selection of a relevant labor market for comparison with Hazelwood's workforce, but did specifically *reject* the Government's attempt to employ the St. Louis metropolitan area for that purpose. 392 F.Supp. at 1287. Given the fact that Hazelwood in fact recruits its teachers from a broad multistate area, majority opinion, at 808–809, I would hold that the relevant labor market can only be accu-

rately defined as the same large multistate area. *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1371 (5th Cir. 1974). Where justified by the record, federal courts have referred to statistics encompassing statewide or even regional areas. *See, e. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 430 n. 6, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 163 (1971) (all of North Carolina); *United States v. Georgia Power Co.,* 474 F.2d 906, 918 (5th Cir. 1973) (the entire South). I would affirm the District Court's finding that no discrimination was proved.

The broad scope of the remedy adopted by the majority is even more distressing in my view. The relief imposed is a prime example of the heavy-handed manner in which the federal courts have interfered in the operation of local schools, to the detriment of the schools and taxpayers, resulting in a misdirection of tax funds voted by the people for educational purposes. The permanent injunction is unwarranted in this case, for it compels the federal courts to monitor operation of the Hazelwood district on an endless basis, thus subjecting the district to the imposition of serious sanctions and penalties possible under a contempt finding.

I take particular exception to the imposition of job selection criteria and hiring preferences and to the requirement that the district must provide, for federal inspection, a record "explaining its reasons for selecting a white applicant over available black applicant(s) for each vacancy filled during the three-year period." Majority opinion, at 819. This is a long step in the direction of reverse discrimination operating only in favor of a specified minority. *See DeFunis v. Odegaard,* 416 U.S. 312, 336, 94 S.Ct. 1704, 1716, 40 L.Ed.2d 164, 180 (1974) (Douglas, J., dissenting) ("There is no constitutional right for any race to be preferred."). The instant record fails to reveal any exceptional circumstances to justify such a remedy. *Cf. Carter v. Gallagher,* 452 F.2d 315, 331 (8th Cir.), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). Preferential remedies of this sort should be resorted to only when no alterna-

tive means exist for eradicating discrimination.

In essence, the majority seeks to hire black teachers without regard to the relevant employment criteria—professional qualification, teaching talent, skills and experience—and in spite of the racial and ethnic makeup of the student, teacher and taxpayer composition of the school district and the larger relevant labor market. Under the majority rationale every qualified black must be hired irrespective of the relevant labor market and the qualifications of competing white teachers. Surely, neither the Constitution nor the statute, Title VII, mandates such an extensive interference in local school operations.